*235
 
 Opinion
 

 ELIA, J.
 

 Gary Neal Johnson appeals a judgment of conviction entered after severed trials on charges of murder and kidnapping, with allegations of firearm use, prior convictions, and special circumstances.
 

 In the first trial, the jury found defendant guilty of the second degree murder of Adrianne Gilliam, who disappeared in June 1979.
 

 In the second trial, concerning events in August 1986 arising out of a failed drug transaction, the jury found defendant guilty of the first degree murder of James Carver. The jury found true the allegation that defendant used a firearm in the commission of the offense. (Pen. Code, § 12022.5.)
 
 [1]
 
 The jury also found defendant guilty of kidnapping Jeff Powers (§ 207, subd. (a)), and found true the allegation that he used a firearm in committing the kidnapping. The jury found not true the special circumstance allegation that the murder of James Carver occurred during the commission of the kidnapping. (§ 190.2, subd. (a)(17)(ii).) Defendant waived jury trial on the prior felony allegations and on the prior murder special circumstance. The trial court found true the allegations that defendant had previously been convicted of a serious felony (§ 667) and had served prison terms for two prior felony convictions (§ 667.5, subd. (b)). The trial court also found true the prior murder special circumstance allegation. (§ 190.2, subd. (a).)
 

 Following Johnson’s unsuccessful motion to strike the special circumstance finding and to reduce the degree of the murder conviction, the trial court sentenced him to state prison as follows: first, a determinate sentence of fourteen years, comprised of a five-year midterm on the kidnapping count with a two-year enhancement for firearm use, two 1-year enhancements for prior prison terms, and a five-year prior serious felony enhancement; next, an indeterminate sentence of fifteen years to life imprisonment for the second degree murder conviction, to run consecutively to the determinate sentence; finally, a sentence of life imprisonment without possibility of parole for the first degree murder conviction, to run consecutively to the indeterminate sentence.
 

 Defendant now appeals, claiming reversible error in both trials. Finding none, we affirm the judgment.
 

 
 *236
 
 I.
 
 First Trial
 

 A.
 
 Facts
 

 Adrianne Gilliam was 16 years old when she first met defendant. Three weeks after meeting him, she moved in with him. They lived together for the next three years. On June 22, 1979, she disappeared and was never seen again.
 

 At the time of her disappearance, Adrianne worked for a temporary agency as a nursing assistant. On June 22, 1979, she had been assigned to work at the Skyline Convalescent Home.
 

 Adrianne reported for work on that date at about 7 a.m. Because she was not wearing a nurse’s uniform, the nurse in charge of staffing sent Adrianne home. She was upset at not being allowed to work.
 

 Clarice Johnson, defendant’s mother, was living with defendant and Adrianne in June 1979. Clarice last saw Adrianne when she came home from work, unhappy at having to change her clothes. Adrianne never returned after leaving a second time for work that morning.
 

 On the day of Adrianne’s disappearance, defendant worked from about 6:45 a.m. to 3:15 p. m. without leaving his work premises. During the weekend of June 23-24, 1979, defendant telephoned Paul Skinner, his employer, to say that he might not come to work on Monday because his wife was missing and he had to look for her.
 

 Police investigations into Adrianne’s disappearance began in 1979, when defendant made a missing-person report, and continued sporadically for the next seven years.
 

 Initial efforts failed to yield significant clues. On Monday, June 25, 1979, defendant provided police investigators with a list of people to contact. He also informed them that Adrianne frequently hitchhiked. The following day, believing the police were not doing all they could to find Adrianne, defendant confronted the investigators in an emotional manner, demanding to speak to the chief of police.
 

 Within a couple of days after Adrianne’s disappearance, defendant contacted her mother, Rosemary Daubek, and her brother, Randy Miller. He asked a friend to help him search for Adrianne in the San Jose area. Defendant seemed distraught at her disappearance.
 

 
 *237
 
 At least once in July 1979 defendant consulted psychic Kathlyn Rhea in an attempt to discover Adrianne’s whereabouts. He had two theories about the disappearance: one, that she had gone to her grandmother in New Jersey; the other, that she had met with foul play. He showed Ms. Rhea a letter from the grandmother, dated July 4, 1979, indicating that the grandmother had not seen Adrianne. Ms. Rhea described psychic impressions of a car with blue metal, a car with a blood-stained interior, and an area in some hills located near water. Defendant drove through the Santa Cruz mountains searching for signs of Adrianne.
 

 The investigation resumed in 1984. Sergeant James Morin contacted Adrianne’s mother and grandmother, checked IRS records under Adrianne’s Social Security number, and left messages for defendant, who failed to return the calls. Defendant did not wish to discuss the case. When Sergeant Morin pressed him for details, he became upset.
 

 In 1985 defendant married Lenora Colburn. They moved to Kansas, where they owned and operated a bar. Defendant’s mother lived with them. One night some bikers came to the bar, bringing their own liquor. Defendant and Lenora decided to drink with them. Lenora became intoxicated and went home to bed. She woke to find defendant beating and threatening to kill her, telling her that what had happened to Adrianne would happen to her. Clarice attempted to intervene. Defendant dragged her from the room by the throat. Lenora escaped and sought shelter at a women’s crisis center. She told a worker there that defendant had indicated he had killed Adrianne and could kill her, too. Lenora acknowledged on cross-examination that at the time of the beating she had been intoxicated and could not remember precisely what defendant had said. After she had had time to think about what had happened, she did not take defendant’s comments as an admission that he had killed Adrianne. She did not at that time report his statements to the police.
 

 Defendant had struck Lenora once before, when she was taunting him about possibly having killed Adrianne.
 

 Sergeant John Kracht took over the investigation in 1986. He interviewed defendant, who denied any involvement in Adrianne’s disappearance.
 

 Sergeant Kracht also interviewed Pam Miller, Adrianne’s sister. While living in a foster home, Pam had visited Adrianne and defendant regularly during 1978 and 1979. Pam claimed to have visited every weekend and testified to seeing defendant strike Adrianne during each of her visits. Sometimes he slapped her. Occasionally he would hit her with a closed fist. Usually the abuse would occur in response to Adrianne’s “talking back” to
 
 *238
 
 him. Pam had never reported the abuse to anyone, fearing that to do so would jeopardize her visits to Adrianne. She maintained her silence after Adrianne disappeared because she did not associate the abuse with the disappearance. She decided to tell what she had seen when Sergeant Kracht told her that defendant had admitted to another county jail inmate that he had killed Adrianne.
 

 Pam’s social worker could not recall meeting Adrianne and did not remember Pam’s visits to Adrianne. The visits would have been arranged through the social worker or her foster parents. Had she known of the abuse, the social worker would have stopped the visits.
 

 Pam’s foster father testified that Pam had a good relationship with her sister, but that she had probably made at most about a half-dozen visits to Adrianne.
 

 Ken Hewitt, a friend of defendant, testified that Adrianne and defendant appeared to be compatible and in love. He never witnessed physical violence or serious arguments between them.
 

 Clayton Meece, another friend of defendant, testified that Adrianne and defendant appeared to get along well most of the times he saw them together. He did not see any physical violence or serious arguments between them. However, once when Meece arrived at their home for a visit, defendant and Adrianne were teary-eyed and told him to come back another time. Their behavior led him to suppose they had had some kind of problem. Also, Clarice Johnson once called Meece at 3 a.m. to tell him that defendant was in the hospital, having tried to kill himself. Defendant told Meece his suicide attempt had to do with a disagreement with Adrianne. These two occurrences led Meece to think that the relationship was deteriorating.
 

 Defendant’s statements to various witnesses concerning the circumstances of Adrianne’s disappearance varied considerably. In 1979 he told the police investigator he suspected Adrianne may have tried to hitchhike home from the convalescent hospital because she had hitchhiked frequently in the past. He gave no information corroborating this suspicion. Defendant told his friend Ken Hewitt that a nurse at the hospital had seen Adrianne hitchhiking home. Ken told Sergeant Kracht that defendant said people at the convalescent home had seen Adrianne getting into “either a blue 1957 Chevrolet or a blue older beat-up Chevrolet.” When Pam Miller telephoned to arrange another visit with Adrianne, defendant told her Adrianne had disappeared. He told Pam she had come home from work to change shoes, and because she missed her bus back to work decided to hitchhike. He told Pam that the landlord of their apartment building had seen a truck stop and two men pull
 
 *239
 
 Adrianne into the truck. Defendant told Rosemary Daubek that Adrianne worked from midnight to eight in the morning and that she had not come home from work and had been missing for two days. However, in his initial missing-person report, defendant said he had dropped Adrianne off at a bus stop at about 7 a.m. on the day she disappeared. Hepburn Klemm, defendant’s boss in 1977 and 1978, recalled defendant telling him both that Adrianne had disappeared and that he believed she had not disappeared but was living in her family’s home. Defendant said he was keeping the home under surveillance.
 

 B.
 
 Discussion
 

 1. Testimony of Defendant’s Wife Was Properly Admitted
 

 Defendant urges that the trial court erred in rejecting his assertion of the privilege for marital communications
 
 [2]
 
 in an attempt to prevent Lenora from testifying at trial that, in Kansas during the summer of 1985, while inflicting a severe beating on her, defendant said words to the effect that what had happened to Adrianne would happen to her. Lenora had previously testified at the preliminary hearing regarding the beating and the statement. At that time, defense counsel made no attempt to assert the privilege. Indeed, any such attempt would have been futile. The marital communication privilege does not exist in a criminal proceeding in which one spouse is charged with committing a crime against the other; the complaint charged defendant with attempting to murder Lenora in August 1986 and that charge was still pending at the time of the preliminary hearing. (Evid. Code, § 985, subd. (a).) Because that charge was dismissed before trial, defendant argues the statements he made to Lenora should have been afforded the protection of the privilege at trial. The trial court ruled the statements admissible, finding “there was a waiver at the prelim.”
 

 The statements were properly admitted. Once disclosed during Lenora’s testimony at the preliminary hearing, the statements lost their confidential character. (Evid. Code, § 912, subd. (a).) After the statements were made public, the marital communication privilege could no longer be asserted. The reason for the privilege—to encourage confidences between spouses for the benefit of the marital relationship—ceased to operate when confidentiality was lost. (See
 
 People
 
 v.
 
 Clark
 
 (1990) 50 Cal.3d 583, 619-620 [268 Cal.Rptr.
 
 *240
 
 399, 789 P.2d 127], cert. den. _ U.S. _ [112 L.Ed.2d 425, 111 S.Ct. 442] [disclosure by psychotherapist of patient’s threats to kill persons eliminated confidentiality of statements and precluded future assertion of privilege].)
 

 We doubt, too, whether the statements assumed the mantle of confidentiality when they were first made, inasmuch as defendant, in abusing Lenora, abused the relationship on which the privilege is predicated. In
 
 People
 
 v.
 
 Carter
 
 (1973) 34 Cal.App.3d 748 [110 Cal.Rptr. 324], certiorari denied 419 U.S. 846 [42 L.Ed.2d 75, 95 S.Ct. 81] (1974), the court held a marital communication, made while the husband was assaulting his wife, not confidential. The court observed that “[t]he privilege afforded to a confidential marital communication is based on considerations of public policy which seek to preserve the confidence and tranquility of the marital relationship. The essence of a confidential communication between spouses is that it springs from the confidence which exists between them because of the marital relationship, [¶] These public policy considerations would not be served by shielding as confidential and privileged threats against third persons made by one spouse in the course of criminally victimizing the other spouse.”
 
 (Id.
 
 at pp. 752-753.)
 

 Our conclusion that defendant’s statements to his wife lost their confidentiality in her preliminary hearing testimony makes it unnecessary to address another rationale for admission, advanced apparently for the first time on appeal: that the statements were not intended to be confidential when made, due to the presence of Clarice Johnson somewhere in the home at the time when defendant was assaulting Lenora and making the statements. We merely note that although California law recognizes no privilege for marital communications “in the hands of a third party,” such as an eavesdropper
 
 (Rubio
 
 v.
 
 Superior Court
 
 (1988) 202 Cal.App.3d 1343, 1348 [249 Cal.Rptr. 419]), we have identified no case holding that a mere possibility that the third party listened to the communication, absent any showing that the spouse is aware that the third party may be able to overhear, suffices to overcome the privilege.
 

 In his opening brief, defendant suggests that trial counsel rendered ineffective assistance by failing to object, at the preliminary hearing, to Lenora’s testimony on the basis of the marital communication privilege. In his reply brief, he submits that because there was no privilege to waive, the ineffective assistance issue is “moot.” We agree. To establish ineffective assistance, defendant must demonstrate that his counsel failed to act in a manner to be expected of a reasonably competent attorney acting as a diligent advocate. In addition, defendant must show that but for counsel’s failings it is reasonably probable that a result more favorable to defendant
 
 *241
 
 would have occurred.
 
 (People
 
 v.
 
 Fosselman
 
 (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144].) The element of incompetent performance is absent here. There being no privilege to assert at the preliminary hearing (Evid. Code, § 985, subd. (a)), counsel did not perform incompetently in not malting a futile objection to Lenora’s testimony.
 

 2.
 
 Prosecution Established Corpus Delicti Sufficiently to Permit Admission of Defendant’s Extrajudicial Statements
 

 In a prosecution for murder, as in any other criminal case, the corpus delicti—death caused by criminal agency—must be established independently of defendant’s extrajudicial statements, confessions, or admissions.
 
 (People
 
 v.
 
 Towler
 
 (1982) 31 Cal.3d 105, 115 [181 Cal.Rptr. 391, 641 P.2d 1253].) The prosecutor is not required to establish the corpus delicti by proof as clear and convincing as is necessary to establish the fact of guilt; rather, slight or prima facie proof is sufficient for this purpose.
 
 (Ibid.)
 
 “ ‘To meet the foundational test the prosecution need not eliminate all inferences tending to show a noncriminal cause of death.’ ”
 
 (Ibid.)
 
 Instead, the foundation may be laid by the introduction of evidence that creates a reasonable inference that the death could have been caused by a criminal agency, even in the presence of an equally plausible noncriminal explanation of the event.
 
 (Ibid.,
 
 italics omitted.)
 

 Defendant contends the prosecution failed to lay an evidentiary foundation as to Adrianne’s death by criminal agency sufficient to permit receipt of his extrajudicial statements in evidence. As defendant sees it, the evidence apart from his statements consists exclusively of Adrianne’s disappearance after being sent home from work and her failure to take with her any personal possessions. He points out that Adrianne owned little, and it is not inconceivable that she would have abandoned what she did possess had she secretly intended to run away.
 

 Although the evidence pointing to Adrianne’s death by criminal agency is not compelling, we hold that inference may reasonably be drawn.
 

 First, the circumstances of her disappearance suggest that she did not voluntarily leave. She had gone to work that morning and, upset at being turned away for want of a proper uniform, returned home to change into proper working attire. After changing, she left and was never seen again. Adrianne left behind such important items as her wallet, containing a driver’s license, Social Security card, check cashing card, and GEMCO department store membership card, a letter informing her of her GED (General Educational Development) test score; her nursing certification; an employment registration card; educational transcripts; and letters from her
 
 *242
 
 grandmother and sister. It seems unlikely that, having taken the trouble to conform her dress to the requirements of her job, Adrianne left her home and such significant personal belongings only to run away.
 

 Second, the fact that after her disappearance Adrianne never contacted members of her family with whom she had fairly close relationships tends to establish that she did not leave home willingly. The record showed that before her disappearance Adrianne had regular contact with her sister Pam, her brother Randy, and her mother. In addition, she corresponded regularly with her grandmother, who lived in New Jersey. Pam testified that she visited Adrianne and defendant every weekend from 1978 to the time of her disappearance in June 1979; Pam and Adrianne had a good relationship. Randy testified that he stayed with Adrianne and defendant for about a week during the summer of 1979. His relationship with his sister was fairly close. Rosemary Daubek, Adrianne’s mother, testified that she saw Adrianne about once a month and had a close relationship with her daughter. It is unlikely that a young woman of 19 having such close family ties would voluntarily disappear without ever resuming contact with her relatives.
 

 Third, the record contains evidence that defendant behaved toward Adrianne in a violent and possessive manner. When Adrianne began living with defendant at the age of 16, she ceased all contact with her mother for 2 years. When Adrianne turned 18, defendant began to bring her to Rosemary’s house for visits, but it seemed to Rosemary that defendant would not allow Adrianne to visit her alone. Once, Rosemary attempted to visit Adrianne at the house she shared with defendant, only to be refused entry because Adrianne was alone and defendant would not permit her to let her mother in unless he were present. Pam testified that, over the course of 18 months, she saw defendant hit Adrianne during each of her weekly visits. He either slapped her or hit her with a closed fist if he were especially angry. His anger was usually triggered by Adrianne’s “talking back” to him. While striking Adrianne, defendant “would get like glassy-eyed and a crazy look on his face.” Then, after a few moments, he would act as though nothing had happened. Other witnesses testified to arguments between defendant and Adrianne.
 

 Defendant argues that evidence of an unexplained disappearance does not satisfy the corpus delicti rule, contending “[t]here is always some unique feature [that] cannot rationally be explained other than by the person’s death.” We assume the element of criminal agency to be implicit in defendant’s proposition. Even so, it misstates the rule. Even when a plausible noncriminal explanation of the disappearance can be hypothesized, a defendant’s extrajudicial statements are admissible provided the prosecution
 
 *243
 
 adduces evidence supporting a reasonable inference that death could have been caused by criminal agency.
 
 (People
 
 v.
 
 Towler, supra,
 
 31 Cal.3d at p. 115.) The prosecution is not required to prove the impossibility or improbability of the supposed victim’s continuing life, or death by noncriminal agency, as a prerequisite to admission of such statements.
 

 Defendant cites a number of corpus delicti cases, each presenting distinctive facts supporting an inference of death by criminal agency. From the absence of comparably distinctive facts in Adrianne’s case, he argues the prosecution failed to establish the corpus delicti.
 

 For example, in the well-known case of
 
 People
 
 v.
 
 Scott
 
 (1959) 176 Cal.App.2d 458, 465-487 [1 Cal.Rptr. 600], the victim left behind a home, substantial wealth, numerous close friends, and such personal items as dentures and eyeglasses. By contrast, Adrianne was far from wealthy and was not shown to have had an active social life.
 

 In
 
 People
 
 v.
 
 Bolinski
 
 (1968) 260 Cal.App.2d 705, 715-716 [67 Cal.Rptr. 347], the missing man disappeared without cashing a pay voucher, only a few days short of the date on which he would have been eligible to draw a pension. He had been known to pick up hitchhikers, and defendant had been hitchhiking in the man’s vicinity at the probable time of the disappearance. The defendant—who did not know the missing man—was nonetheless found in possession of his credit cards and car in another state. Adrianne had no similar economic incentive to stay in her situation, and there was no evidence that defendant benefited financially from her disappearance.
 

 In
 
 People
 
 v.
 
 Scott
 
 (1969) 274 Cal.App.2d 905, 908-911 [79 Cal.Rptr. 587], shortly after the defendant’s wife disappeared he was seen to carry a large, heavy box out of his bedroom to his car; he then drove to a remote spot and buried the box. The defendant allowed his daughters to use his wife’s cosmetics, something she had never permitted. Additionally, within a week after her disappearance he began to dispose of her clothing. The record in this case is lacking in evidence suggesting Johnson disposed of Adrianne’s body in any particular way, but shows that he kept her things after she disappeared.
 

 In
 
 People
 
 v.
 
 Ruiz
 
 (1988) 44 Cal.3d 589, 610-611 [244 Cal.Rptr. 200, 749 P.2d 854], evidence showed that the missing woman, who suffered from cerebral palsy and epilepsy, never contacted her friends, relatives, physician, or pastor following her disappearance, and never sought resumption of her Medi-Cal and Social Security benefits. Adrianne had no comparable disability that would have made it difficult for her to subsist without financial assistance.
 

 
 *244
 
 The features of Adrianne’s life include neither the unusual wealth of the victim in the earlier
 
 Scott
 
 case nor the unusual disability of the victim in
 
 Ruiz.
 
 Yet, if those features are closely examined, her disappearance is as remarkable and as indicative of foul play as theirs. Adrianne vanished under circumstances suggesting she intended to return to work that day. She left behind all her personal effects and never contacted her family. The records of the Internal Revenue Service reflect no activity under Adrianne’s Social Security number after June 22,1979. Possessiveness and abuse characterized her relationship with defendant. While not eliminating every other possibility, these facts suffice to create a reasonable inference that Adrianne died by criminal agency. Consequently, the admission of defendant’s extrajudicial statements was not erroneous.
 

 3. Evidence of Defendant’s Beating of Second Wife Was Properly Admitted and the Jury Was Properly Instructed on Its Limited Purpose
 

 Defendant contends that admission of evidence that he beat Lenora constituted prejudicial error under Evidence Code section 1101.
 
 [3]
 
 At the outset of trial, defendant objected to the admission not only of the statements he allegedly made to Lenora in Kansas during the summer of 1985, but also of evidence that, while making the statements, he was inflicting on her a severe beating.
 

 Lenora testified that after they were married, she and defendant moved to Kansas. There they operated a bar. One evening a group of bikers came into the bar, bringing their own liquor. She and defendant decided to close the bar and drink with the bikers. Lenora became intoxicated and went home before defendant. She awoke later that night to find defendant beating her and saying, “I’m going to kill you. You’re a bitch. You’re nothing but a whore.” While beating her he told her that what happened to Adrianne would happen to her. Clarice intervened by pulling defendant off Lenora. Defendant grabbed Clarice by the throat and removed her from the room. Lenora escaped and called the sheriff’s department. Lenora received treatment at a medical center and sought help at a women’s shelter. She later learned that the bikers had beaten and robbed defendant. Defendant had struck Lenora on
 
 *245
 
 one earlier occasion when she had taunted him by accusing him of killing Adrianne.
 

 Initially the prosecutor said he would offer the beating evidence only to show under what conditions the statement was made. The trial court ruled the fact and nature of the blows admissible as foundational evidence for the statement. Later, the prosecutor argued that the beating evidence—in conjunction with defendant’s contemporaneous statements—was admissible to show defendant’s intent to kill Adrianne. The trial court agreed with the prosecutor and included CALJIC No. 2.50 in its instructions to the jury.
 
 [4]
 
 Citing the evidence of the beating, the prosecutor argued to the jury that defendant entertained express and implied malice in killing Adrianne. Defendant now renews his contention that evidence of his beating of Lenora was improperly admitted. He urges the evidence that he beat his wife in 1985 tended to prove only that he had a disposition to beat his wife in 1979, and so is inadmissible under Evidence Code section 1101, subdivision (a).
 

 People
 
 v.
 
 Thompson
 
 (1980) 27 Cal.3d 303, 314-321 [165 Cal.Rptr. 289, 611 P.2d 883], establishes the framework for analysis of the admissibility of other-crime evidence. When evidence of an uncharged offense is offered to prove a fact from which an inference of another fact may be drawn, under
 
 Thompson
 
 its admissibility depends on three principal factors: (1) the materiality of the fact sought to be proved or disproved; (2) the tendency of the uncharged offense to prove or disprove the material fact; and (3) the applicability of any rule or policy requiring the exclusion of relevant evidence.
 
 (Id.
 
 at p. 315.)
 

 In order to satisfy the requirement of materiality, the fact sought to be proved may be either an ultimate fact at issue in the proceeding or an intermediate fact from which the ultimate fact may be presumed or inferred. (27 Cal.3d at p. 315.)
 

 Other-crime evidence has a tendency to prove a material fact, according to
 
 Thompson,
 
 when it serves, logically and by reasonable inference,
 
 *246
 
 to establish the fact. (27 Cal.3d at p. 316.) In ascertaining the probativeness of the evidence, the court “ ‘must look behind the label describing the kind of similarity or relation between the [uncharged] offense and the charged offense; it must examine the precise elements of similarity between the offenses with respect to the issue for which the evidence is proffered and satisfy itself that each link of the chain of inference between the former and the latter is reasonably strong.’ ”
 
 (Ibid.,
 
 fn. omitted, quoting
 
 People
 
 v.
 
 Schader
 
 (1969) 71 Cal.2d 761, 775 [80 Cal.Rptr. 1, 457 P.2d 841], fn. omitted.) If the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence must be excluded.
 
 (Ibid.)
 

 The
 
 Thompson
 
 court observed that three interrelated extrinsic policies tend to limit admissibility of other-crime evidence. First, Evidence Code section 1101, subdivision (a), requires exclusion of evidence of an uncharged offense if the only theory of relevance is that the accused has a disposition to commit the crime charged, and that this disposition is circumstantial evidence that he behaved accordingly on the occasion of the charged offense. (27 Cal.3d at p. 316.) Second, even if evidence of the uncharged offense is relevant on some theory other than disposition to commit the crime charged, it is excluded under a rule of necessity if it is merely cumulative with respect to other evidence that the prosecution may use to prove the same issue.
 
 (Id.
 
 at p. 317.) Finally, under Evidence Code section 352, the probative value of the other-crime evidence must outweigh its prejudicial effect; due to the inherently prejudicial nature, of such evidence, it must be excluded unless its probative value is substantial.
 
 (Id.
 
 at p. 318.)
 

 The People argue that the beating of Lenora, considered in light of defendant’s simultaneous statement that what happened to Adrianne would happen to her, was probative of and necessary to establish the motive, intent, and identity of Adrianne’s killer, and—given the limiting instruction as well as Pam Miller’s testimony that defendant frequently beat Adrianne—could not unduly have prejudiced the jury. We agree.
 

 As we have noted, the testimony of Pam Miller and Rosemary Daubek showed that defendant acted possessively and abusively toward Adrianne. Defendant’s beating of Lenora was punctuated by possessive and abusive epithets and threats (“bitch,” “whore,” “I’m going to kill you”). The latter threat, and the circumstances of the beating, support the inference that defendant then intended to kill Lenora and might have succeeded in doing so had Clarice not intervened. The conjunction of the beating, the explicit threat and evident intent to kill Lenora, and the veiled reference to Adrianne’s murder logically points to defendant’s motive and intent to kill Adrianne.
 
 Thompson
 
 recognizes that if a person acts similarly in similar situations, he
 
 *247
 
 probably harbors the same intent in each. (27 Cal.3d at p. 319.) Instances of defendant’s abuse of Adrianne and Lenora present similar features and invite the conclusion that his intent in each situation was the same.
 

 Defendant urges us to hold the beating evidence inadmissible on the issue of intent and to reverse his conviction as did the reviewing court in
 
 People
 
 v.
 
 Deeney
 
 (1983) 145 Cal.App.3d 647 [193 Cal.Rptr. 608]. Deeney was accused of killing his wife June, who died of a brain hemorrhage. He maintained June’s death resulted from an accidental fall. The challenged evidence showed that on several occasions Deeney had dragged June, partially clothed, by her feet onto the grass in front of their house, and that he had then sprayed her with water from a garden hose while yelling obscenities at her.
 
 (Id.
 
 at p. 651.) The Court of Appeal held the evidence of abuse improperly admitted on the issue of identity because no close connection existed between Deeney’s acts and June’s death such as would warrant the inference that if Deeney committed the former, he was responsible for the latter.
 
 (Id.
 
 at p. 654.) The court also reasoned that Deeney’s prior acts revealed neither knowledge material to June’s death nor a motive to kill her.
 
 (Ibid.)
 
 Although the court acknowledged the other-act evidence was relevant to rebut Deeney’s defense that June’s death was accidental—in that bruises on her body could have resulted from the abuse and not from an accidental fall—it held the probative value of the evidence too slight to outweigh its prejudicial effect.
 
 (Id.
 
 at pp. 655-656.) The court held that improper admission of other-act evidence along with certain hearsay statements constituted reversible error.
 
 (Id.
 
 at p. 657.)
 

 The salient difference between this case and
 
 Deeney
 
 is that here defendant’s properly admitted threats (“I’m going to kill you” and the statement that what happened to Adrianne would happen to Lenora) illuminate his intent both in the beating of Lenora and in the killing of Adrianne. The fact of the beating, in turn, sheds light on the significance of the statement that what happened to Adrianne would happen to Lenora. Defendant verbally linked his violent abuse of Lenora to the murder of Adrianne. The jury could logically infer from this and the other indications of his violence toward Adrianne that he harbored a murderous intent and motive toward both women. No such linkage can be inferred in
 
 Deeney.
 

 Clearly, the identity of Adrianne’s killer was another disputed issue at trial. Evidence of defendant’s beating of Lenora taken together with his simultaneous threats and allusions to Adrianne, as well as evidence of his violence toward Adrianne and his contradictory statements concerning the circumstances of her disappearance, all tended logically to prove that defendant was Adrianne’s killer. Our reading of
 
 People
 
 v.
 
 Tassell
 
 (1984) 36 Cal.3d
 
 *248
 
 77, 84 [201 Cal.Rptr. 567, 679 P.2d 1], does not substantiate defendant’s contention that “identity” was not disputed in the sense necessary for admission of other-crime evidence.
 
 Tassell
 
 was a prosecution for kidnapping and sex crimes in which identity was conceded, the defense being consent.
 
 (Id.
 
 at p. 83, fn. 3.) Nothing in
 
 Tassell
 
 even remotely suggests that identity is not at issue in a murder prosecution in which the victim’s body cannot be found, there are no eyewitnesses to the killing, and the defendant denies guilt.
 

 Having concluded that evidence of Lenora’s beating was properly admitted to prove motive, intent, and identity, we must determine whether the probative value of the evidence substantially outweighed any possible prejudice.
 

 Thompson
 
 requires us to consider on this score whether the evidence was merely cumulative with respect to other evidence the People presented to prove the same issues. We conclude it was not. Rather, it was necessary to establish intent and identity because other evidence—such as defendant’s contradictory statements concerning the circumstances of Adrianne’s disappearance and Pam Miller’s testimony regarding defendant’s violence toward Adrianne—may not in itself have supplied sufficient proof that defendant intentionally killed Adrianne.
 

 Finally, we are satisfied that the probative value of the evidence substantially outweighed any possible prejudice to defendant. The trial court minimized the danger of prejudice by instructing the jury that evidence of defendant’s uncharged acts was admitted for the limited purpose of proving intent, motive, and identity, not to show that he possessed a bad character or the disposition to commit crimes. (CALJIC No. 2.50.) Moreover, we doubt the evidence that defendant beat Lenora significantly affected the jury’s impression of his character, inasmuch as the jury had already heard Pam Miller’s testimony as to defendant’s frequent acts of violence toward Adrianne.
 

 The evidence that defendant beat Lenora was therefore properly admitted in connection with his abusive and threatening statements, and the jury was correctly instructed on its limited purpose.
 

 II. Special Circumstance Allegation
 

 Defendant contends the trial court erred in permitting the People to amend the information, after the conclusion of the first trial, to allege previously uncharged special circumstances and further erred in refusing to dismiss those allegations on his motion. He urges the amendment punished
 
 *249
 
 him for seeking severance of the two murder charges and therefore gave rise to a presumption of vindictiveness. This, he contends, denied him due process under the rationale of
 
 United States
 
 v.
 
 Goodwin
 
 (1982) 457 U.S. 368, 372 [73 L.Ed.2d 74, 79-80, 102 S.Ct. 2485]. He does not persuade us.
 

 “The seminal cases defining the parameters of permissible prosecutorial charging discretion are
 
 North Carolina
 
 v.
 
 Pearce
 
 (1969) 395 U.S. 711 . . . , and
 
 Blackledge
 
 v.
 
 Perry
 
 (1974) 417 U.S. 21 .... In
 
 Pearce,
 
 the United States Supreme Court held that the due process clause of the Fourteenth Amendment ‘requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial.’
 
 (Id.
 
 at p. 725 . . . .) In
 
 Perry,
 
 the court found a ‘realistic likelihood of “vindictiveness” ’ in a prosecutor’s reindictment of a convicted misdemeanant on a felony charge after the defendant had invoked his right to appeal.
 
 (Id.
 
 at p. 27 . . . .) The due process violation in both cases was not, the court later stated, in the possibility that a defendant might be deterred from exercising a legal right (see
 
 Colten
 
 v.
 
 Kentucky
 
 (1972) 407 U.S. 104 . . . and
 
 Chaffin
 
 v.
 
 Stynchcombe
 
 (1973) 412 U.S. 17 . . .) but ‘in the danger that the State might be retaliating against the accused for lawfully attacking his conviction.’
 
 (Bordenkircher
 
 v.
 
 Hayes
 
 (1978) 434 U.S. 357, 363 . . . .)”
 
 (People
 
 v.
 
 Hudson
 
 (1989) 210 Cal.App.3d 784, 787 [258 Cal.Rptr. 563], cert. den. 493 U.S. 1027 [107 L.Ed.2d 754, 110 S.Ct. 736] (1990).) If the defendant demonstrates facts sufficient to give rise to a presumption of vindictiveness, the burden shifts to the People to rebut the presumption.
 
 (In re Bower
 
 (1985) 38 Cal.3d 865, 872 [215 Cal.Rptr. 267, 700 P.2d 1269].)
 

 California decisions have refrained from presuming vindictiveness in a prosecutor’s pretrial charging determinations.
 
 (People
 
 v.
 
 Hudson, supra,
 
 210 Cal.App.3d at p. 788; see
 
 People
 
 v.
 
 Farrow
 
 (1982) 133 Cal.App.3d 147, 152 [184 Cal.Rptr. 21]; see also
 
 Twiggs
 
 v.
 
 Superior Court
 
 (1983) 34 Cal.3d 360, 368-373 [194 Cal.Rptr. 152, 667 P.2d 1165] [considerations favoring application of presumption only in posttrial contexts apply when, after mistrial occurs and defendant asserts right to jury retrial by rejecting plea bargain, prosecutor amends information to charge five additional prior felony convictions].) Such a presumption would be unworkable in the pretrial context; since section 1009 allows the prosecution to amend the charges against a defendant at any time to include offenses shown by evidence at the preliminary hearing, and since a defendant can assert innumerable pretrial rights, a defendant could assert that retaliation was the motive for any amendment in the charges. (34 Cal.3d at pp. 372-373.) Moreover, as the United States Supreme Court has observed, “[t]here is good reason to be cautious before adopting an inflexible presumption of prosecutorial
 
 *250
 
 vindictiveness in a pretrial setting. In the course of preparing a case for trial, the prosecutor may uncover additional information that suggests a basis for further prosecution or he simply may come to realize that information possessed by the State has a broader significance.”
 
 (United States
 
 v.
 
 Goodwin, supra,
 
 457 U.S. at p. 381 [73 L.Ed.2d at p. 85].)
 

 In contrast, ordinarily once a trial begins, the state has discovered and assessed all of the information against an accused and has made a determination, on the basis of that information, of the extent to which he should be prosecuted. Thus, a change in the charging decision made after an initial trial is completed is much more likely to be improperly motivated than is a pretrial decision. (457 U.S. at p. 381 [73 L.Ed.2d at pp. 85-86].)
 

 Neither the complaints filed in municipal court nor the original superior court information alleged any special circumstances. Prior to trial, defendant moved to sever the charge that he murdered Adrianne from the remaining charges, based mainly on the prejudice he would otherwise suffer due to the lack of cross-admissibility of evidence supporting the respective charges and the asserted weakness of the evidence in the charge involving Adrianne. In his points and authorities in support of the severance motion, defendant noted, as an additional ground for severance, “E. The Possibility of a Special Circumstance Finding. [¶] Although defendant herein has not been charged with special circumstances and the People have stipulated in the Municipal Court that the death penalty would not be sought, nevertheless the sentence that the defendant may be subject to would be extremely harsh if convicted of the charges in the Information. The last factor under
 
 Williams
 
 [v.
 
 Superior Court
 
 (1984) 36 Cal.3d 441 (204 Cal.Rptr. 700, 683 P.2d 699)] is whether or not the defendant conceivably would be eligible for the death penalty if convicted as charged, and that factor is present here as well.” In response, the People observed: “The defendant’s Points and Authorities state he is prejudiced by the possibility of a special circumstance finding. The simple answer to this statement is that special circumstances are not charged. The defendant, however, might actually be prejudiced if the Adrianne case was severed, and he was convicted of murder. The People would be compelled in that scenario to file special circumstances on a double murder theory in the Carver case. There would simply be no reason for this procedure not to be followed.” Defendant’s discovery motion likewise evinced awareness of the possibility of special circumstance filings.
 

 The trial court denied defendant’s motion to dismiss the special circumstance allegations. It found no surprise or due process violation, given that the prosecutor expressly stated his intention to consider such allegations in opposing the severance motion and given that “special circumstances clearly
 
 *251
 
 have been in the mind of both parties in earlier stages of the proceedings . . The court concluded that the circumstances did not raise a presumption of vindictive prosecution, but reasoned that if the presumption did arise, it was overcome by the fact of the conviction in the Adrianne case.
 

 The unusual procedural stance of this case differs from that of the typical pretrial charging determination. The amendment occurred pretrial vis-á-vis the Carver case but posttrial vis-a-vis the Adrianne conviction, on which the prior murder special circumstance allegation was predicated.
 
 [5]
 
 Because the charges arising out of the Carver incident were being tried for the first time when the special circumstance allegations were added, we believe the considerations operative in the pretrial context—favoring prosecutorial flexibility and discretion to respond to new or changed circumstances with appropriate charging amendments—apply to this case. The verdict in the Adrianne case was a new fact to which the prosecutor was entitled to respond with the prior murder special circumstance allegation. That it was a possibility all along did not mean the conviction was not a new circumstance warranting amendment. As soon as feasible after the return of the verdict in the Adrianne case, some two months before jeopardy attached in the Carver case, the prosecutor sought the amendment. Defendant cannot plausibly claim surprise.
 

 Moreover, the present situation is distinguishable from
 
 Perry, Twiggs,
 
 and
 
 Bower
 
 in another respect: unlike the defendant who asserts a right to a retrial after a mistrial or a successful appeal of his conviction, the defendant moving for severance seeks a procedural determination within the sound discretion of the trial court. (See § 954;
 
 People
 
 v.
 
 Mason
 
 (1991) 52 Cal.3d 909, 933 [277 Cal.Rptr. 166, 802 P.2d 950] [defendant can defeat consolidation only on clear showing of prejudice].) Defendant was not punished for asserting a right. Rather, he made a tactical choice to face trial on the weaker charge first, knowing that a conviction could change the posture of the Carver case. Defendant criticizes the People’s reliance on the authority of plea bargaining cases such as
 
 Bordenkircher
 
 and
 
 Goodwin,
 
 arguing that there is no comparable “give-and-take” in the severance context. His criticism is not well-taken. It is not the inherent give-and-take of plea bargaining that validates upward charging determinations in the pretrial context; rather, it is the societal interest in not foreclosing the prosecutor from modifying the course of the prosecution when he or she uncovers additional information that suggests a further basis for prosecution or when he or she comes to realize that the information the state already possesses has a broader significance than at first believed.
 
 (United States
 
 v.
 
 Goodwin, supra,
 
 457 U.S. at
 
 *252
 
 p. 381 [73 L.Ed.2d at pp. 85-86].) The societal interest operates similarly in this case.
 

 Thus, on the peculiar facts before us, we hold that the amendment adding special circumstance allegations prior to the trial of the Carver murder charge inferentially supports neither an appearance nor a presumption of vindictiveness.
 

 III. Second Trial
 

 A.
 
 Facts
 

 When defendant and Lenora returned to San Jose from Kansas in 1986, Lenora began to deal in methamphetamines. Soon after, defendant likewise started dealing. On about August 7, 1986, defendant and Lenora went to Randy Vasseur to ask if he could help them locate a methamphetamine supplier. At Vasseur’s house they met Jeff Powers, who said he could arrange a purchase. Powers said his uncle in Redding might supply the drug. The uncle was unable to accommodate them that night and told Powers to call back the next morning.
 

 The next day, Friday, defendant gave Powers $1,000 to buy the drugs. For the next 24 hours or so, defendant did not see Powers.
 

 On Friday and Saturday, Powers made various attempts to obtain the methamphetamine for defendant. His uncle, who had been arrested, could not assist him. Eventually Powers met a woman named Debbie who offered to find the drugs. He stayed at her house Friday night. On Saturday, around noon, she bought a half ounce of methamphetamine for $500 of defendant’s money from someone who came to her driveway.
 

 Meanwhile, defendant telephoned and made two visits to the house where Powers lived with his girlfriend, Tammy Butler. He claimed Powers owed him money. On the phone, defendant said something to Tammy’s mother about “blowing somebody away.” On his second visit, defendant took motorcycle parts belonging to Powers as collateral for the $1,000.
 

 Late Saturday evening, Tammy called defendant and arranged to meet him at a bar near her home. She was angry at Powers for not coming home for several days and offered to help defendant find Powers. Lenora and defendant met her at the bar. Tammy informed them that Powers was staying with another woman. Tammy, followed by defendant and Lenora, drove to Debbie’s apartment. They learned that Powers had earlier left there with Dan
 
 *253
 
 Damron. They continued to search for Powers. Having no success, they drove back to Debbie’s.
 

 Damron had twice come to Debbie’s apartment that afternoon. Once James Carver accompanied him. Damron told Powers that Tammy was looking for him. Tammy, he said, had gone to the house of a friend, Linda Boettcher, to look for Powers. Tammy had told Boettcher that someone with a gun was looking for Powers. Powers understood this to refer to defendant because he knew defendant had a gun. On Damron’s second visit to Debbie’s, Powers told him he needed to purchase a half ounce of methamphetamine. Damron said he knew of a source. He agreed to drive Powers around to a few places to try to obtain the drug. Carver stayed behind with Debbie. On the way to Damron’s car, Powers hid the half ounce he had purchased earlier in a tool box in Debbie’s garage. As soon as he did so, he realized Damron had been watching.
 

 Damron and Powers drove around for two hours, unsuccessfully attempting to buy the methamphetamine. Finally they pulled into a darkened driveway near Debbie’s apartment. Damron put a gun to Powers’s ribs and took the remaining $500 of defendant’s money. He handcuffed Powers, ordered him out of the car, and drove off toward Debbie’s house.
 

 Powers remembered the methamphetamine he had hidden in Debbie’s garage and began to run in that direction. By this time defendant and Lenora had returned to Debbie’s and saw Powers running down the street. As Powers neared their car, defendant aimed his .357 magnum at Powers and demanded his money. Powers denied having the money, showed defendant the handcuffs, and told him he had been robbed. At that point Powers saw Damron’s car pull out of Debbie’s driveway. Damron was driving and Carver was a passenger. Powers shouted to Johnson, “There he is, he’s got your money, he’s ripping you off.” Defendant ordered Powers into his car. He pulled into Debbie’s driveway. He and Powers went into the garage to look for the half ounce of methamphetamine that Powers had hidden there. It was gone. They went into the apartment to ask Debbie where Damron and Carver might have gone. She did not know.
 

 Defendant was extremely angry, several times stating somebody was going to pay. He said that whatever happened during the course of the night, “somebody was going to end up in Alviso,” which Jeff understood to mean that defendant was going to kill someone and leave the body in Alviso. However, according to Powers, defendant also said he did not intend to kill anyone.
 

 Defendant, Lenora, and Powers drove around, looking for Damron. Powers produced a handcuff key and the handcuffs were removed. Eventually Powers directed defendant to Boettcher’s apartment.
 

 
 *254
 
 At about midnight on Saturday night, Boettcher returned to her home with her children and her boyfriend, John Hanehan, after a visit to the county fair. They put the children to bed and sat on the couch in the living room. Damron and Carver arrived. Damron visited with Linda’s roommate in her bedroom. Carver remained in the living room with Boettcher and Hanehan.
 

 When someone knocked at the front door, Carver got up and started to open it. When the door was halfway open he tried to close it again, but to Boettcher it seemed someone was trying to push the door open. Carver stepped back from the doorway. The door was thrown open. Boettcher testified that defendant stepped into the house, held his gun with both hands, arms extended, and shot Carver. Hanehan and Boettcher testified that defendant several times asked, “Where’s Danny?” As he stood, pointing the gun at them, the bedroom door opened. Damron came out and ran down the hallway toward the bathroom. Defendant ran after him. Boettcher heard a sound of breaking glass. She and Hanehan shouted that children were sleeping in the back bedroom. Defendant turned and ran back out the front door.
 

 Boettcher later found her bathroom window broken. Blood was on the bathtub, floor, and window.
 

 Defendant testified in his own behalf. As he and Powers approached the house, his gun was in the waistband of his pants. Jeff knocked on the door. Once the door began to open, defendant helped Jeff push on it. When Powers yelled, “There’s Danny,” defendant pulled out his gun and tried to move to the side to defend himself. He did not remember how the gun was fired or whether it hit anything. When he stepped into the house, he saw Carver still standing and holding his neck. He realized Carver had been shot, but not that he had shot him. Defendant asked, “Where’s Danny?” He heard a window break and took several steps into the hallway. Linda told him there were children back there, and he turned to leave.
 

 After returning to his car, defendant told Lenora he thought he had shot someone. Later on Sunday he told her he had shot Carver while trying to get at Damron. He said the gun had gone off accidentally at the door. That day, and on several other occasions, he asked her not to tell anyone about the shooting.
 

 Before his arrest, defendant took all the guns he and Lenora owned and disposed of them in the Santa Cruz mountains. He threw the .357 magnum in Sprig Lake, where it was later found.
 

 
 *255
 
 In his initial statement to police, defendant claimed that Powers had jumped out of the car near a shopping center after being unhandcuffed, and that he and Lenora had simply driven home at that point. He contended he was the victim of a conspiracy of people involved in drug dealings. In November 1986 defendant admitted he had gone to Boettcher’s house and shot Carver, but maintained the shooting was accidental.
 

 B.
 
 Discussion
 

 1. Trial Court Did Not Err in Instructing on Felony Murder
 

 Defendant urges his conviction must be reversed because the trial court instructed the jury on felony murder although the information charged neither felony murder nor the underlying felony of attempted robbery. He asserts that, in
 
 People
 
 v.
 
 Dillon
 
 (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697], the California Supreme Court held felony murder and premeditated murder to be separate crimes, the latter being defined in section 187 and the former in 189. The amended information charged defendant with killing James Jon Carver unlawfully and with malice aforethought in violation of section 187, without referring to section 189. Defendant contends he cannot be convicted of the uncharged crime of felony murder
 
 (People
 
 v.
 
 Lohbauer
 
 (1981) 29 Cal.3d 364, 368-369 [173 Cal.Rptr. 453, 627 P.2d 183]) and because it is impossible to tell from the verdict whether the jury believed he committed felony murder or premeditated murder, he insists reversal is required.
 
 (People
 
 v.
 
 Green
 
 (1980) 27 Cal.3d 1, 69-71 [164 Cal.Rptr. 1, 609 P.2d 468].)
 

 The defendant in
 
 Dillon
 
 mounted a twofold attack on the felony-murder rule in California, contending that (1) it was an uncodified common law rule the court should abolish; and (2) if, alternatively, the rule were embodied in a statute, the statute was unconstitutional.
 
 (People
 
 v.
 
 Dillon, supra,
 
 34 Cal.3d at p. 462.) Analyzing the pertinent legislative history, the Supreme Court concluded that section 189 was intended to codify the felony-murder rule. The court held, therefore, that the felony-murder rule could not be judicially abrogated.
 
 (Id.
 
 at pp. 462-472.) The court then rejected the defendant’s due process arguments, holding that malice is not an element of felony murder and accordingly that the rule does not effect an unconstitutional “conclusive presumption” of an element of the crime.
 
 (Id.
 
 at pp. 472-476; see
 
 Mullaney
 
 v.
 
 Wilbur
 
 (1975) 421 U.S. 684 [44 L.Ed.2d 508, 95 S.Ct. 1881];
 
 Sandstrom
 
 v.
 
 Montana
 
 (1979) 442 U.S. 510 [61 L.Ed.2d 39, 99 S.Ct. 2450].)
 

 Based on
 
 Dillon’s
 
 conclusion that section 189 has been both a degree-fixing statute and a codification of the felony-murder rule since its inception
 
 *256
 
 in 1872, defendant reasons that he was convicted of an uncharged offense, in excess of the trial court’s jurisdiction. He urges that
 
 People
 
 v.
 
 Witt
 
 (1915) 170 Cal. 104 [148 P. 928], and cases following it, erred in holding that a charge of murder in violation of section 187 permits conviction of first degree felony murder.
 

 Defendant errs in interpreting
 
 Dillon
 
 as holding that felony murder and premeditated murder are two distinct crimes.
 
 (People
 
 v.
 
 Scott
 
 (1991) 229 Cal.App.3d 707, 713 [280 Cal.Rptr. 274].)
 
 Dillon
 
 treats felony murder and premeditated murder as “two kinds of first degree murder” requiring different elements of proof.
 
 (People
 
 v.
 
 Dillon, supra,
 
 34 Cal.3d at pp. 476-477.) The language defendant quotes from the opinion (“the two kinds of murder are not the ‘same’ crimes”)
 
 (id.
 
 at p. 476, fn. 23) was merely employed to refute Dillon’s “narrow equal protection argument” that defendants charged with felony murder, unlike those charged with premeditated murder, are not allowed to reduce their degree of guilt by evidence negating the element of malice.
 
 (Ibid.)
 

 The Supreme Court confirmed this interpretation of
 
 Dillon
 
 in
 
 People
 
 v.
 
 Guerra
 
 (1985) 40 Cal.3d 377 [220 Cal.Rptr. 374, 708 P.2d 1252], Writing for the court, Justice Mosk stated as follows:
 

 “Defendant next contends the court erred by refusing to give an instruction requiring the jurors to agree unanimously on a single theory of first degree murder in order to return a first degree murder conviction. It is settled, however, that ‘in a prosecution for first degree murder it is not necessary that all jurors agree on one or more of several theories proposed by the prosecution; it is sufficient that each juror is convinced beyond a reasonable doubt that the defendant is guilty of first degree murder as that offense is defined by the statute.’ [Citation.] Defendant provides no compelling reason or authority that would require us to depart from this rule, and we decline to do so.” (40 Cal.3d at p. 386.)
 

 Defendant objects to citation of
 
 Guerra
 
 for the proposition that there is but one crime of murder, albeit comprised of the two theories we have discussed, since the court apparently did not face an issue identical to that raised here. We are confident, however, that the logical underpinnings of
 
 Guerra
 
 support our conclusion. Appellate courts not uncommonly must apply legal principles gleaned by analogy from earlier authorities.
 

 People
 
 v.
 
 Thomas
 
 (1987) 43 Cal.3d 818 [239 Cal.Rptr. 307, 740 P.2d 419] decided an issue analogous to defendant’s
 
 Dillon
 
 argument. In
 
 Thomas,
 
 an information charged the defendant with “ ‘[violation of Section 192.1 . . . ’ ” and alleged that he “ ‘did wilfully, unlawfully, and with/o[ut] malice
 
 *257
 
 aforethought kill [the victim]’ . . .”
 
 {Id.
 
 at p. 824.) Thomas contended that he was charged with voluntary manslaughter and his conviction of involuntary manslaughter denied him his right to fair notice of the charges against him. The California Supreme Court rejected his contentions. The court held that a valid accusatory pleading need not specify by number the statute under which the accused is being charged, that specifying the wrong code section may be “immaterial,” that pleading surplusage is inconsequential, and that even if the accusatory pleading is unclear the defendant must demonstrate prejudice in order to obtain appellate relief.
 
 (Id.
 
 at pp. 826-832.) When notice of the particular circumstances of the offense is given by the transcript of the evidence before the committing magistrate, the court held, that notice is conclusive.
 
 (Id.,
 
 at p. 829.)
 

 Moreover, in dicta
 
 Thomas
 
 stated that “it has long been the law in this state that an accusatory pleading charging murder need not specify degree or the manner in which the murder was committed. [Citations.] Thus, even where the People intend to rely on a felony-murder theory, the underlying felony need not be pleaded in the information. [Citation.] Neither is it necessary to specifically plead the charged murder was wilful, deliberate, and premeditated. [Citation.] So long as the information adequately alleges murder, the evidence adduced at the preliminary hearing will adequately inform the defendant of the prosecution’s theory regarding the manner and degree of killing. [Citation.]” (43 Cal.3d at p. 829, fn. 5.)
 

 We concur with the reasoning expressed in
 
 People
 
 v.
 
 Watkins
 
 (1987) 195 Cal.App.3d 258 [240 Cal.Rptr. 626]. In concluding that an information charging murder is sufficient to charge either premeditated murder or felony murder, the
 
 Watkins
 
 court stated:
 
 "Dillon,
 
 which interprets, rather than reinterprets, section 189, should not be read to change the well-accepted rule of pleading set forth in
 
 People
 
 v.
 
 Witt.
 
 Whether murder is committed with malice, or in the context of felony murder, the crime committed is still murder. And while identification of the statute violated is advisable, it is not required. [Citation.]”
 
 (Id.
 
 at p. 267.) Defendant’s criticisms of
 
 Watkins,
 
 which are largely traceable to his misunderstanding of
 
 Dillon,
 
 fail to persuade us to the contrary.
 

 Defendant warns that our reading of
 
 Guerra
 
 generates due process problems. He contends that if jurors need not agree unanimously on the theory of murder, their deliberative processes may be streamlined to a point at which one cannot be certain every juror is satisfied each element of the crime has been proved beyond a reasonable doubt.
 
 (In re Winship
 
 (1970) 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068]; see also
 
 Hicks
 
 v.
 
 Oklahoma
 
 (1980) 447 U.S. 343 [65 L.Ed.2d 175, 100 S.Ct. 2227].) He provides neither empirical nor legal support for his contentions. Permitting conviction of murder upon
 
 *258
 
 a unanimous verdict of guilt without requiring unanimity on the theory of murder is simply not the equivalent of allowing conviction on the vote of only seven or eight jurors out of twelve.
 
 (See Apodaca
 
 v.
 
 Oregon
 
 (1972) 406 U.S. 404, 411-412 [32 L.Ed.2d 184, 191-192, 92 S.Ct. 1628];
 
 Burch
 
 v.
 
 Louisiana
 
 (1979) 441 U.S. 130 [60 L.Ed.2d 96, 99 S.Ct. 1623].)
 

 Defendant complains that the prosecutor’s announcement, near the end of the People’s case, that he would argue a felony-murder theory provided insufficient notice to enable him to defend against that theory. The claim fails for two reasons.
 

 First, evidence that the purpose of defendant’s visit to Hanna Street was to take back his property by force was explored at the preliminary hearing. Under California law, an allegation charging murder and preliminary hearing testimony provide adequate notice of the prosecution’s theory as to the manner and degree of killing.
 
 (People
 
 v.
 
 Thomas, supra,
 
 43 Cal.3d at p. 829, fn. 5.)
 

 Second, opening statements at trial indicated the evidence would show defendant entered the Hanna Street house in order to retrieve his money from Damron. Whether defendant intended to kill Carver, or to take his money forcibly from Damron, were questions the prosecutor raised. Defense counsel argued the evidence would show defendant merely wanted his money or property back and carried a gun because he believed Damron was armed.
 

 Third, after his midtrial request for the felony-murder instruction, the prosecutor called three additional witnesses, two of them police officers who had interviewed eyewitnesses to the Carver shooting. Defense counsel cross-examined each witness. The defense then called nine witnesses, including a police officer who had testified for the People, and defendant himself testified. After the prosecutor first explicitly raised the felony-murder theory, therefore, the defense had the opportunity to examine and cross-examine witnesses on the circumstances of the Carver killing, including the robbery attempt component of the felony-murder theory.
 

 The fact that defendant had the opportunity to examine and cross-examine witnesses on the robbery theory distinguishes this case from
 
 Sheppard
 
 v.
 
 Rees
 
 (9th Cir. 1990) 909 F.2d 1234. In
 
 Sheppard,
 
 defendant was charged with one count of murder under section 187 of the California Penal Code and with the use of a firearm. The case was tried on the theory that the killing was premeditated and deliberate, precipitated by an alleged “debt” from a cocaine transaction. At no time during pretrial proceedings, opening statements, or the taking of testimony was the concept of felony murder raised.
 
 *259
 
 After the prosecution and defense each rested and submitted proposed jury instructions to the court, and after the instructions were apparently settled, the prosecutor for the first time requested that instructions on robbery and felony murder be given in conjunction with those on premeditated murder.
 
 (Id.
 
 at p. 1235.) Over defendant’s objection, the trial court so instructed the jury. Defendant was convicted. After an unsuccessful appeal, he sought federal habeas relief. The district court denied his petition, but the court of appeals reversed and directed issuance of the writ.
 
 (Id.
 
 at p. 1238.) The state conceded, and the court agreed, that “the difficulty in this case arises not because California’s murder pleading practice furnishes inadequate notice, but because a
 
 pattern of government conduct affirmatively misled the defendant,
 
 denying him an effective opportunity to prepare a defense. ‘The defendant was ambushed.’ ”
 
 (Id.
 
 at p. 1236, italics in original.) The court concluded the error was reversible per se because it was of a kind that necessarily rendered the trial fundamentally unfair.
 
 (Id.
 
 at pp. 1237-1238.) The fact that the error affected the composition of the record militated in favor of automatic reversal.
 
 (Id.
 
 at p. 1237 [citing
 
 Rose
 
 v.
 
 Clark
 
 (1986) 478 U.S. 570, 579, fn. 7 (92 L.Ed.2d 460, 471, 106 S.Ct. 3101)].)
 

 In contrast, defendant here had the opportunity to present his own evidence on the theory of felony murder and to rebut that of the prosecution. Defendant has not shown that a pattern of government misconduct affirmatively misled him. We find no error of constitutional dimension.
 

 2.
 
 Trial Court Properly Refused “Claim-of-Right” Instruction
 

 Defendant contends the trial court erred in refusing to instruct the jury that intent to commit robbery is lacking when the taker entertains a good-faith belief that he has a right to the property taken, even if the belief is mistaken.
 
 (People
 
 v.
 
 Butler
 
 (1967) 65 Cal.2d 569, 573 [55 Cal.Rptr. 511, 421 P.2d 703].) An exception to this general rule applies when the purported right is based in an illegal endeavor.
 
 (People
 
 v.
 
 Gates
 
 (1987) 43 Cal.3d 1168, 1181-1182 [240 Cal.Rptr. 666, 743 P.2d 301]; see also
 
 People
 
 v.
 
 Hendricks
 
 (1988) 44 Cal.3d 635, 642 [244 Cal.Rptr. 181, 749 P.2d 836], cert. den. 488 U.S. 900 [102 L.Ed.2d 236, 109 S.Ct. 247].) In the latter case, felonious intent is not negated.
 

 Defendant characterizes his transaction with Powers as a “bailment” and questions whether the methamphetamine may be deemed the product of a notoriously illegal activity. The former contention, even if valid, cannot assist him, and the latter approaches the frivolous. He does not persuade us the facts here are significantly different from those in
 
 Gates,
 
 where the homicide occurred in the course of the defendant’s attempt to obtain his
 
 *260
 
 share of the proceeds from a forgery ring, or in
 
 Hendricks,
 
 where the defendant killed the victim after breaking into the latter’s residence in order to recover money owed him for his services as a prostitute.
 
 (People
 
 v.
 
 Gates, supra,
 
 43 Cal.3d at pp. 1181-1182;
 
 People
 
 v.
 
 Hendricks, supra,
 
 44 Cal.3d at p. 642.) Defendant questions whether he would have been guilty of robbery if, the moment after he gave Powers the $1,000, someone had robbed Powers and defendant had chased the robber and recovered the money. We need not decide whether a claim-of-right instruction would have been required on the hypothetical facts defendant suggests. When defendant attempted to rob Damron, the illegal transaction was half-consummated. These facts hardly stretch the felony-murder concept beyond the function it is intended to serve.
 

 The claim-of-right instruction was unwarranted in another respect. It was Powers, not Damron, who owed defendant $1,000. When- he entered the house on Hanna Street, defendant had already obtained possession of collateral consisting of Powers’s motorcycle parts to secure the obligation. In testimony, defendant repeatedly acknowledged that, on the night of the murder, he viewed the missing money as Powers’s “problem.” Any right defendant may have had extended only to property in Powers’s possession. (See 2 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) § 647, pp. 728-729.)
 

 3. Trial Court Did Not Abuse Its Discretion in Permitting Impeachment by Prior Murder Conviction
 

 Defendant contends the trial court erred in overruling his objection to the use of the Adrianne murder conviction to impeach his testimony, and in refusing to “sanitize” the conviction by allowing reference to it only as an unspecified “felony” conviction.
 

 The trial court ruled that defendant’s 1970 conviction for aggravated escape and his 1979 conviction for assault with a deadly weapon would be admitted for impeachment purposes. In objecting to further impeachment by the murder conviction, defendant argued that (1) murder does not reflect greatly on honesty or veracity; (2) a limiting instruction would be ineffective to prevent undue prejudice; (3) other felony priors could be used to impeach him; and (4) the other evidence of drug dealing would not allow defendant to maintain a false aura of veracity. The court rejected these arguments. The court reasoned that in a murder case in which identity is not at issue—and in which prosecution witnesses have been impeached with numerous prior felonies while the defendant seeks to portray himself as a victimized citizen with a minor criminal record—a prior murder conviction is very probative of credibility. The court also noted that the Carver case did not present gory or
 
 *261
 
 heinous details, impliedly finding that impeachment by the Adrianne conviction would not be inflammatory. Relying on the latter finding, the court refused to sanitize the murder conviction.
 

 The trial court did not abuse its discretion. There is no automatic limitation on the number or nature of prior convictions of crimes involving moral turpitude that may be used to impeach a witness.
 
 (People
 
 v.
 
 Muldrow
 
 (1988) 202 Cal.App.3d 636, 646-647 [248 Cal.Rptr. 891] [no abuse of discretion in admission for impeachment of six prior felony convictions, three identical to charged offense];
 
 People
 
 v.
 
 Dillingham
 
 (1986) 186 Cal.App.3d 688, 695 [231 Cal.Rptr. 20];
 
 People
 
 v.
 
 Stewart
 
 (1985) 171 Cal.App.3d 59, 65-66 [215 Cal.Rptr. 716] [no abuse of discretion in ruling three prior robbery convictions admissible to impeach robbery defendant].) There can be no doubt that a conviction for murder reflects the “readiness to do evil” that defines moral turpitude. (See
 
 People
 
 v.
 
 Castro
 
 (1985) 38 Cal.3d 301, 314 [211 Cal.Rptr. 719, 696 P.2d 111];
 
 People
 
 v.
 
 Olmedo
 
 (1985) 167 Cal.App.3d 1085, 1097-1098 [213 Cal.Rptr. 742] [assault with intent to commit murder as crime of moral turpitude];
 
 People
 
 v.
 
 Coad
 
 (1986) 181 Cal.App.3d 1094, 1110-1111 [226 Cal.Rptr. 386] [voluntary manslaughter as crime of moral turpitude].) Although we must, of course, scrutinize with care the impeachment use of prior convictions of crimes identical to a charged offense because of the heightened prejudice, no rule dictates their exclusion. Here, defendant testified that he shot Carver accidentally, while prosecution witnesses testified that defendant entered the Hanna Street house and assumed a police crouch before shooting Carver. Because the credibility of several prosecution witnesses had been impeached with prior convictions, the trial court could properly conclude that admission of defendant’s prior murder was necessary to inform the jury fully as to defendant’s credibility. The record demonstrates that the trial court carefully considered relevant factors in reaching its determination, which we must uphold.
 

 4. Prosecutor Did Not Delve Impermissibly Into Facts of Defendant’s Prior Convictions
 

 Defendant contends the trial court erred reversibly in permitting the prosecutor to delve into details of his prior convictions during cross-examination. (Pe
 
 ople
 
 v.
 
 Schader
 
 (1969) 71 Cal.2d 761, 773 [80 Cal.Rptr. 1, 457 P.2d 841];
 
 People
 
 v.
 
 Terry
 
 (1974) 38 Cal.App.3d 432, 446 [113 Cal.Rptr. 233] [disapproved on other grounds in
 
 People
 
 v.
 
 Gainer
 
 (1977) 19 Cal.3d 835, 846 (139 Cal.Rptr. 861, 566 P.2d 997, 97 A.L.R.3d 73)].)
 

 The prosecutor asked defendant whether he had been convicted in 1970 in Kansas “of a felony, aggravated escape by threat or violence.” Defendant replied, “I was convicted of an aggravated escape, yes.” The charging
 
 *262
 
 document in the Kansas proceedings alleged that defendant violated section 21-3810 of the Kansas Statutes Annotated
 
 [6]
 
 in that he, “by the use of threat or violence against Lewis Jayne, escape[d] while being held in custody on a charge or conviction of drawing and uttering or delivering an insufficient funds check . . . .” The following exchange then occurred:
 

 “Q And it was with the use of either a threat or violence; is that right?
 

 “A No, it wasn’t.
 

 “Q Well, why don’t you tell the jury what you did to cause you to be convicted of this particular crime twenty years ago?
 

 “Mr. Goldscheider [defense counsel]: Objection. Irrelevant and improper impeachment.
 

 “The witness: I’d like to answer.
 

 “The Court: Wait a minute. Overruled.
 

 “Q (By Mr. Hey [prosecutor]) Okay. Tell the jury what you did.
 

 “A I was being held in the Kansas City jail at that time, the Reno County Jail, on a $5 felony check charge in 1970 in Kansas.
 

 “Two other people—one by the name of Jim Mitchell and the other one by the name of Gary something—I can’t remember his name—escaped from the county jail. The door was left open. I escaped with them.
 

 “Q You took a hostage with you; isn’t that true?
 

 “A No.
 

 “Q Didn’t you overpower somebody who was—
 

 “A No.
 

 “Q—There was a person there who was overpowered; isn’t that right?
 

 
 *263
 
 “A Yes, there was.
 

 “Q And that was when you were convicted?
 

 “A Yes.
 

 “Q So it wasn’t—You simply just didn’t walk away from the jail? A person was overpowered, and you managed to escape; is that right?
 

 “A Yes. Two people overpowered a person, and I walked out third.
 

 “Mr. Goldscheider: Your Honor, so I don’t have to indicate an objection every time, I would like to have a standing objection to all of these matters.
 

 “It’s irrelevant to the issue before the jury.
 

 “The Court: Overruled. But we’ll have to—the standing objection is denied.”
 

 The prosecutor then asked, and defendant confirmed, that in 1980 defendant was convicted of felony assault with a deadly weapon, with an enhancement for use of a handgun.
 

 Finally, the prosecutor turned to the conviction for the murder of Adrianne, asking:
 

 “Q And at the present time on a separate charge, you stand convicted of a second-degree murder; is that right?
 

 “A Yes, I do.
 

 “Q And that was in 1979?
 

 “A That was—I was convicted of that in 1988 after the charges were brought on this.
 

 “Q Right. It was right here in this particular court by a jury; is that right?
 

 “A Yes, that’s true.
 

 “Q And I was the D.A., right?
 

 “A Yes, you were.
 

 
 *264
 
 “Q But that was a murder that occurred in 1979; is that right?
 

 “A I still say it didn’t occur.
 

 “Q Oh. In 1979—The murder was of the person that you were living with, Adrian Gillian |>zc] at that time; is that right?
 

 “A No.
 

 “Mr. Goldscheider: I object to all of this.
 

 “The Court: All right. That will be sustained pending the hearing.
 

 “Mr. Goldscheider: I ask that the jury be admonished to disregard all the questions and answers.
 

 “The Court: Oh, no—only the last one.” The court clarified that the stricken answer pertained to the identity of the victim. After further off-record discussion at the bench, the prosecutor asked:
 

 “Q (By Mr. Hey) You were convicted of second-degree murder by a jury in this very court about two or three months ago; is that right?
 

 “Mr. Goldscheider: Objection.
 

 “Impeachment.
 

 “The Court: Overruled.
 

 “Q (By Mr. Hey) You may answer.
 

 “A Yes.
 

 “Q And you simply have just answered no, that that murder didn’t occur; is that right?
 

 “A Yes.
 

 “Q A jury found otherwise in that particular case; is that right?
 

 “A Yes.
 

 “Mr. Goldscheider: Objection.
 

 
 *265
 
 Conclusion of the witness.
 

 “The Court: Overruled.”
 

 Defendant complains that the prosecutor’s initial question concerning the aggravated escape conviction “seemingly prompted” him to deny force or threat of force by implying that the prosecutor knew otherwise. We do not agree. The prosecutor’s question mirrored the language of the charging document. Defendant’s explanation of the circumstances of the escape apparently stemmed not from coercion, deceit, or other inappropriate prosecutorial tactics, but from his own desire to give his side of the events. Nor can we say that the bulk of the prosecutor’s questions regarding the murder conviction improperly delved into details of the crime. Defendant’s initial admission suggested to the jury that he had been accused of murdering Adrianne only because of the pendency of the current charges, and his subsequent denials that the murder ever occurred necessitated clarification by the prosecutor. The only factual detail elicited was the identity of the victim, and the trial court on counsel’s objection ordered the question and answer stricken and admonished the jury. No reversible error appears on these facts.
 

 5. Questions to Defendant About His Alleged Comments to Jurors in First Trial Did Not Amount to Prejudicial Misconduct
 

 Defendant contends that the prosecutor engaged in misconduct in cross-examining him concerning statements he made to the jury in the first murder trial after they returned their verdict. The prosecutor asked:
 

 “Q And, in fact, after the jury convicted you in that case, you screamed and yelled at them; is that right?
 

 “Mr. Goldscheider: Objection.
 

 “The Witness: No, I did not.
 

 “The Court: Sustained.
 

 “Mr. Goldscheider: It isn’t true.
 

 “The Court: No comments on the answer. Don’t let that happen again.
 

 “The answer will be stricken. The jury is instructed to disregard it.
 

 “Q (By Mr. Hey) What happened when you walked through that hall there and the jury was standing outside in the hall?
 

 
 *266
 
 “A I said I hope you can live with yourselves.
 

 “Q You were screaming it at them; were you not?
 

 “A No, I did not.
 

 “Mr. Goldscheider: I’m objecting to all of this, Your Honor.
 

 “It’s irrelevant and utterly prejudicial.
 

 “The Court: Overruled.”
 

 The defense called as a witness the deputy sheriff who was escorting defendant through the hallway during the encounter with the jurors. The deputy testified that defendant spoke to the jurors in a “medium range and tearful” voice.
 

 The People argue that, in the context of defendant’s evasive answers to questions about his prior convictions, the trial court properly allowed the prosecutor to ask questions about his reaction to the earlier jury’s verdict. They contend that when a defendant in effect continues to protest his innocence and accuses the jury of rendering a false verdict, that behavior is admissible in a subsequent trial because it reflects on his credibility as a witness in denying his guilt of the current charges. Although the contention is not wholly devoid of logic, the chain of their reasoning is spun rather fine. In the rare case in which this sort of evidence is available, factors such as undue prejudice and excessive consumption of time will likely favor its exclusion. However, we cannot say the trial court abused its discretion in permitting the questioning. Furthermore, any prejudice was minimized by the deputy’s testimony.
 

 Disposition
 

 The judgment is affirmed.
 

 Premo, Acting P. J., and Cottle, J„ concurred.
 

 Appellant’s petition for review by the Supreme Court was denied November 21, 1991.
 

 [1]
 

 All further statutory citations are to the Penal Code unless otherwise noted.
 

 [2]
 

 Subject to Evidence Code section 912 and except as otherwise provided in this article, a spouse (or his guardian or conservator when he has a guardian or conservator), whether or not a party, has a privilege during the marital relationship and afterwards to refuse to disclose, and to prevent another from disclosing, a communication if he claims the privilege and the communication was made in confidence between him and the other spouse while they were husband and wife. (Evid. Code, § 980.)
 

 [3]
 

 “(a) Except as provided in this section and in Sections 1102 and 1103, evidence of a person’s character or a trait of his character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his conduct) is inadmissible when offered to prove his conduct on a specified occasion.
 

 “(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident) other than his disposition to commit such acts.” (Evid. Code, § 1101.)
 

 [4]
 

 “Evidence has been introduced for the purpose of showing that the defendant committed criminal acts other than that for which he is on trial, [¶] Such evidence, if believed, was not received, and may not be considered by you, to prove that he is a person of bad character, or that he has a disposition to commit crimes. [¶] Such evidence was received, and may be considered by you only for the limited purpose of determining if it tends to show: [¶] The existence of the intent which is a necessary element of the crime charged; [¶] The identity of the person who committed the crime, if any, of which the defendant is accused; or [¶] A motive for the commission of the crime charged. H] Now, for the limited purpose for which you may consider such evidence you must weight [sic] it in the same manner as you do all other evidence in the case. [¶] You are not permitted to consider or discuss such evidence for any other purpose.” (CALJIC No. 2.50.)
 

 [5]
 

 Because the jury found not true the remaining special circumstance allegation (i.e., that the killing of James Carver occurred in the commission of the kidnapping of Jeffrey Powers (§ 190.2, subd. (a)(17)(ii)), we need not address the propriety of adding that allegation.
 

 [6]
 

 “Aggravated escape from custody is; (a) Escaping while held in lawful custody upon a charge or conviction of felony; or (b) Escaping while held in custody on a charge or conviction of any crime when such escape is effected or facilitated by the use of violence or the threat of violence against any person.” (Kan. Stat. Ann. § 21-3810.) The sentencing minutes reflect that defendant pleaded guilty to Kansas Statutes Annotated section 21-3810, without specifying a subsection.