Filed 5/22/13  P. v. Trinidad CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JORGE MARTIN TRINIDAD,<br><br>Defendant and Appellant. | F062786<br><br>(Super. Ct. No. F11900271)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Arlan L. Harrell, Judge.

Joanne Kirchner, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Kari L. Ricci Mueller, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Fifteen-year-old defendant Jorge Martin Trinidad was convicted of first degree murder and second degree robbery after he repeatedly stabbed Marcella Ramos and took her purse. On appeal, he contends (1) the trial court erred in refusing to instruct the jury on the right to use force to recover stolen property, (2) the trial court erred in refusing to instruct the jury on the claim-of-right defense to robbery, and (3) defense counsel was ineffective for failing to object to the prosecutor's closing argument on provocation and voluntary manslaughter. We will affirm.

## PROCEDURAL SUMMARY

On February 17, 2011, the Fresno County District Attorney charged defendant with first degree murder (Pen. Code, § 187, subd. (a);[1] count 1) and second degree robbery (§ 211; count 2). As to count 1, the information further alleged that defendant personally used a knife during the commission of the crime (former § 12022, subd. (b)(1)).

A jury found defendant guilty on both counts and found the special allegation true. The trial court sentenced defendant to 25 years to life on count 1, plus a one-year enhancement on the special allegation. The court stayed sentence on count 2.

## FACTS

On October 14, 2010, sometime around 6:00 a.m., Dolores dropped off her 33-year-old cousin, Marcella, near a gas station on the northwest corner of Winery and Kings Canyon. Marcella was there to engage in prostitution. She walked north toward the Big Lots store on the same corner. About 20 to 25 minutes later, Dolores received a call from Marcella, telling her to come back and pick her up near the Big Lots store. Dolores heard rustling sounds and thought Marcella sounded out of breath.

When Dolores arrived, she saw Marcella on the sidewalk on the west side of Winery, near the Big Lots store. Dolores realized Marcella was having difficulty

---

[1] All statutory references are to the Penal Code unless otherwise noted.

breathing and she saw blood on the left side of her abdomen. Dolores got help from passers-by who called the police.

At about 6:30 a.m., Officers Swanson and Scott arrived and found Marcella lying on the sidewalk next to the Big Lots store on the west side of Winery. She was covered in blood and there was blood on the sidewalk underneath her. Another Hispanic female was standing over her yelling. Officer Swanson saw five to 10 stab wounds on Marcella, and he attempted to stop the bleeding from her chest wounds. Marcella was gurgling and gasping for air, unable to say anything to the officers. An ambulance arrived three to five minutes later. Marcella had surgery at the hospital, but she did not survive.

Detective Cervantes spoke to Dolores at the scene. She said Marcella was carrying a black fake leather purse and a black Page Plus cell phone. When officers went to the hospital, they learned that the purse and phone did not arrive with Marcella.

Detective Valles arrived on the scene at 7:45 a.m. He observed a bloody jacket on the sidewalk where Marcella had lain. A blood trail led from the jacket diagonally across the street, ending at a black T-shirt that was in the road near the curb on the east side of Winery. The neck of the black T-shirt had been stretched out.

Detective Serrano determined that Marcella's cell phone was active. It had sent a Spanish text message after Marcella had been killed, at about 9:00 a.m., to a specific cell phone owned by a woman in Madera. Detective Serrano visited the woman and learned that her 15-year-old daughter, Doris, was the primary user of the phone. Detective Serrano went to Doris's school and spoke to her. Doris said she had received a text message in Spanish that morning from a male named George or Jorge whom she had recently met in Fresno. Doris accompanied Detective Serrano back to Fresno.

Detective Cervantes spoke to Doris at the station. He translated the Spanish text message sent from Marcella's cell phone at 9:00 a.m. as follows: "Mija [a term of endearment], what are you doing? This is George. This will be my phone until the number is disconnected."

3.

At this point, the officers determined they would use Doris to lure defendant out. At 2:08 p.m., while the officers were discussing the plan with Doris, she happened to receive a call from defendant. Detective Cervantes was able to record the call with his digital recorder. According to the plan, Doris asked defendant where he was and said they could meet later. Defendant said he was in the area of Kings Canyon and Dearing, near the major cross streets of Kings Canyon and Chestnut. Doris told him she was going to have her oldest sister drive her to the area so they could meet. Defendant said he would prefer for her to pick him up on a side street because he had been involved in an altercation and the police were looking for him. Then he apologized and said he would have to meet her later; he had to go to his stepbrother's because the police were going to get him. He explained that he had gotten into a fight with some individuals that morning at an apartment complex near Kings Canyon and Winery, which he called "[T]he Wineries," and that he had stabbed a female. He said the police had been investigating the case since about 6:00 a.m., and he did not want to go out on the street. He said the police were going to kill him.

At 4:26 p.m., defendant called again to arrange a meeting with Doris. He said they would meet at a bus stop near Kings Canyon and Chestnut. Then he said he would wait in the parking stalls because he was afraid the police would be there.

At 4:34 p.m., defendant called Doris a third time. By now, Doris was in the backseat of an undercover vehicle with Detective Cervantes. Defendant told Doris that he was walking with a friend to Kings Canyon and Chestnut. She asked him what he was wearing. She told him she was there, but she had passed Chestnut and was coming around. He giggled, then stressed to her that she should hurry because he did not want to be out on the street for long. He told her he would to be in front of the Halloween Superstore on the northwest corner of Kings Canyon and Chestnut. At this point, Detective Cervantes was observing defendant and his friend. Detective Cervantes informed undercover officers in the area. They exited their vehicles wearing tactical

4.

vests and badges, approached defendant, ordered him to drop the cell phone he was holding in his right hand and lie on the ground. The cell phone was a black Page Plus phone. The officers conducted a pat-down search of defendant and found a folding switchblade knife in a black nylon sheath and another cell phone, which was later found to be inactive other than as a musical device. They arrested defendant.

Detective Cervantes noticed that a group of people had congregated nearby to watch the officers arresting defendant. Detective Cervantes approached and spoke to a 16-year-old boy who said defendant came to his apartment on Sierra Vista at about 7:00 a.m. that morning. Defendant told him he had been involved in a fight and had stabbed a person. Defendant had some lottery tickets with him. Defendant cleaned a bloody knife and changed into clean clothes. Detective Cervantes showed the boy the switchblade knife taken from defendant and the boy identified it as the bloody knife defendant had cleaned that morning.

Detective Cervantes also spoke to a 16-year-old girl who said she knew defendant. She said he came to her apartment on Dearing that morning at about 9:00 a.m. She saw him using a Page Plus cell phone and sending text messages with it. She said defendant told her he had been involved in a fight at about 6:00 a.m. at The Wineries apartment complex. He said a female was trying to "get at him" and she took his wallet.

At the station, Detective Cervantes interviewed defendant's 17-year-old friend who was with defendant when he was arrested. The friend said he saw defendant that afternoon at an apartment on Dearing. Defendant told him he had been involved in a fight. The friend saw defendant sending text messages on the black Page Plus cell phone before he was arrested. The friend said defendant was 17 years old.

Another person, also from an apartment on Dearing, told officers she saw defendant with two cell phones that day. Defendant told her he had purchased the phones, but he could not provide the name of the cell phone service provider.

Detectives interviewed defendant at the station. He initially identified himself as 19-year-old Jesus Aburto. After he was read his *Miranda*[2] rights, he agreed to speak to the officers. He said he was drinking with some friends at an apartment complex on Winery, just north of the crime scene. Around 6:00 a.m., he left and was walking south on Winery toward the gas station when he met Marcella. He asked her for a lighter and she said she did not have one. She asked him, "Do you want to do some business?" Defendant took this to mean sexual intercourse. They agreed he would pay her $20 for sex. He paid her and they walked into an alley perpendicular to Winery. Defendant lay down near the trash can and Marcella faced away from him, but she got up and left without doing what they had agreed upon. He told the officers they would find a condom behind a U-shaped cinderblock wall dumpster enclosure at the east end of the alley.

Defendant explained that since no sexual act had occurred, he tried to get his $20 back from Marcella. He took his knife out and told her, "Give me back my fucking money." She would not give him the money, so he grabbed the cell phone she was talking on and he ran back toward the apartments. As he went into the apartment complex, he realized he did not have his wallet. He came back onto the street and saw Marcella. She ran when she saw him, but he caught her. She grabbed him[3] and he did not know what to do, so he grabbed her purse and took off running. Defendant did not mention a stabbing.

The detectives told defendant they knew he was omitting certain things and he needed to provide more details. He then explained that after he realized his wallet was gone, he came back to recover it. He realized it was in Marcella's purse. When he caught up to her, they struggled over the purse as he tried to remove it from her person. They exchanged blows. Marcella pulled his shirt off. She punched him, and he punched

---

**2**     *Miranda v. Arizona* (1966) 384 U.S. 436.

**3**     He pointed to his crotch.

her a few times and pushed her to the ground. He had his knife out and he told her he wanted his wallet back. She had the purse on her right side and she would not let go of it, so he got on top of her and stabbed her two to five times on the left side of her torso. Defendant demonstrated this for the detectives with a few "very, very slight," slow, and "nonchalant" stabbing motions.

After stabbing her, he took the purse and ran north through an apartment complex. On his way, an unknown male looked as though he was going to try to swing at him, so he punched the male in the face. Defendant jumped a fence and then went through the purse to remove the contents. He took his wallet and some lottery tickets from the purse. He left the purse and the remaining contents in the back of the apartment complex. He still had Marcella's cell phone. Defendant told the detectives he knew what he did was wrong, but it was her fault, not his.

Based on defendant's information, officers went to the alley behind the strip mall. At the end of the alley, behind a U-shaped cinderblock wall, they found an unused condom and a condom wrapper in the location defendant had specified.

Officers also went to the location defendant said he left Marcella's purse. They found the purse with the contents—including makeup, a compact, some condoms, a child's pacifier, and identification cards—strewn about.

Defendant took officers to a backpack hidden under a car at the Sierra Vista apartment complex (where he had changed his clothes that morning). The backpack contained used lottery tickets.

Defendant's alien registration card with his picture showed him to be 21 years old. Elementary school transcripts, however, showed him to be only 15 years old. At this point, Detective Cervantes did not know if defendant was 15, 17, 19, or 21 years old. In a second interview, Detective Cervantes inquired again. This time, defendant gave his true name and birth date, and explained that he had the registration card because he

needed to be a certain age to work. Defendant weighed about 150 pounds and was the appropriate size for a 15-year-old.

Dr. Chambliss, a pathologist, conducted the autopsy on Marcella's body on October 15, 2010. Marcella weighed 156 pounds, and her system contained some methamphetamine, but no alcohol. The cause of her death was a stab wound to the chest that penetrated the heart's left ventricle and caused her to bleed to death within minutes. Another chest stab wound was directed downward, penetrating the spleen. She suffered five other wounds to the left chest area that did not penetrate her body cavity. In addition, she suffered wounds under her arm, on the back of her right forearm (completely penetrating her arm), on the front of her right forearm, on her upper left arm, and on her lower left leg. In total, Marcella suffered 16 stab and puncture wounds.

According to Dr. Chambliss, the knife found on defendant could have created the type of wounds on Marcella's body.

In addition to the stab wounds, Dr. Chambliss found a blunt trauma injury, an internal bruise, on the left side of Marcella's scalp, just above her forehead. Dr. Chambliss saw no injuries, including defensive wounds, on Marcella's hands.

Dr. Chambliss examined Marcella's jacket and sweatpants and determined that the damage to the clothing was consistent with her stab wounds.

On cross-examination, Dr. Chambliss explained that Marcella would have been able to engage in activity after being wounded until her blood pressure dropped too low and/or the blood accumulated around her heart and stopped its functioning. The methamphetamine in her system could have made her more excitable and aggressive, and possibly stronger. It also could have raised her blood pressure. Dr. Chambliss agreed that her leg wounds could have occurred while her legs were raised, and the wound under her arm could have occurred if she lifted her arm to attack.

## DISCUSSION

**I.      Instruction on Right to Recover Stolen Property**

Defendant contends the trial court erred in failing to instruct sua sponte that a homicide may be justified when a robbery victim uses reasonable force to recover stolen property.  Defendant asserts that he was relying on this defense and there was substantial evidence that he used force against Marcella to retrieve his stolen wallet.  He argues that the question of whether the force he used to recover his wallet was reasonable or excessive was a question for the jury.  He maintains that the failure to instruct was not harmless because, had the jury been instructed properly, he likely would have been convicted of a lesser crime than first degree murder.  We conclude any error was harmless.

Robbery is "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."  (§ 211.)  "'[M]ere theft becomes robbery if the perpetrator, having gained possession of the property without use of force or fear, resorts to force or fear while carrying away the loot.  [Citations.]  In order to support a robbery conviction, the taking, either the gaining possession or the carrying away, must be accomplished by force or fear.  (See § 211.)'  (*People v. Cooper* (1991) 53 Cal.3d 1158, 1165, fn. 8; *People v. Estes* (1983) 147 Cal.App.3d 23, 27-28.)"  (*People v. Pham* (1993) 15 Cal.App.4th 61, 65 (*Pham*).)  Thus, "a robbery is committed when the defendant has taken possession of the victim's property and forcibly prevents the victim from regaining the goods, however temporarily.  [Citations.]"  (*Id*. at pp. 67-68.)

The victim of a robbery "has a right to use reasonable force to recover his [property] and, if actually or apparently reasonably necessary, to kill the robber in so doing.  But when the point of reasonable force is passed, justification ceases [citation]."  (*People v. Young* (1963) 214 Cal.App.2d 641, 648 (*Young*) [where "defendant's money was snatched from his hand so quickly that no particular force was required and no fear

9.

engendered upon the instant, but mere demand for return of the money brought forth the opened knife and the threat to cut defendant's head off and he was in fear for his life"]; *People v. Randle* (2005) 35 Cal.4th 987, 1002-1003 & fn. 6 (*Randle*) [citing *Young* and recognizing right to pursue and use reasonable force to retrieve stolen property], disapproved on other grounds in *People v. Chun* (2009) 45 Cal.4th 1172, 1201.)

Here, Marcella took defendant's wallet without force or fear, or even his knowledge. But when defendant discovered the loss and confronted her, demanding return of his wallet, she used force to physically resist his recovery of his stolen wallet. We believe at this point Marcella's mere theft of the wallet became a robbery and defendant was entitled to use *reasonable* force to recover his property. (*Pham, supra,* 15 Cal.App.4th at pp. 65-67; *Young, supra,* 214 Cal.App.2d at p. 648; *Randle, supra,* 35 Cal.4th at pp. 1002-1003 & fn. 6.)

There was no evidence that defendant used *reasonable* rather than excessive force when he stabbed Marcella, who was apparently unarmed, *16 times*, many of them to the torso, with a switchblade to recover his stolen wallet. (See *Randle, supra,* 35 Cal.4th at p. 1003 [the beating went well beyond any force the victims were entitled to use to recover their property].) Thus, we find the trial court had no sua sponte duty to give the instruction. Assuming, without deciding, that the trial court was required to instruct on this defense theory, we are confident the jury would not have found defendant's use of force to be reasonable and therefore conclude any error in failing to give the instruction was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.)

## II.     Instruction on Claim-of-Right Defense

Defendant also asserts that the trial court should have instructed sua sponte on the claim-of-right defense to robbery because he had a good faith belief that he had a right or claim to the property when he took Marcella's purse. Again, we conclude any error was harmless.

10.

"An essential element of any theft crime is the specific intent to permanently deprive the owner of his or her property. [Citation.]" (*People v. Williams* (2009) 176 Cal.App.4th 1521, 1526.) ""Although an intent to steal may ordinarily be inferred when one person takes the property of another, particularly if he takes it by force, proof of the existence of a state of mind incompatible with an intent to steal precludes a finding of either theft or robbery. It has long been the rule in this state and generally throughout the country that a bona fide belief, even though mistakenly held, that one has a right or claim to the property negates felonious intent. [Citations.] A belief that the property taken belongs to the taker [citations], or that he had a right to retake goods sold [citation] is sufficient to preclude felonious intent. Felonious intent exists only if the actor intends to take the property of another without believing in good faith that he has a right or claim to it. [Citation.]" [Citation.]' [Citation.]" (*People v. Tufunga* (1999) 21 Cal.4th 935, 943.) "'[A] trial court is not required to instruct on a claim-of-right defense unless there is evidence to support an inference that [the defendant] acted with a subjective belief he or she had a lawful claim on the property.' [Citations.]" (*Id.* at p. 944.)

Assuming the evidence supported the claim-of-right defense and the trial court therefore erred in failing to instruct on it, we nevertheless conclude any error was harmless because it is not conceivable that the jury would have found defendant not guilty of robbery had the trial court so instructed. The claim-of-right defense would have applied only to defendant's taking of Marcella's purse, but not his taking of her cell phone, to which he had no possible claim of right. Seeking recovery of money lost in an illegal prostitution transaction would not support such a claim. (*People v. Tufunga, supra*, 21 Cal.4th at pp. 953-954, fn. 5 [claim-of-right defense "is not available where the claim of right to the property is founded in a 'notoriously illegal' transaction"], citing *People v. Hendricks* (1988) 44 Cal.3d 635, 642 [fee collection for prostitution services]; *People v. Gates* (1987) 43 Cal.3d 1168, 1182 [distribution of proceeds from forgery ring], disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 458-

11.

459; *People v. Johnson* (1991) 233 Cal.App.3d 425, 456-458 [payment for a drug deal].) The evidence was overwhelming that defendant robbed Marcella of her cell phone. He admitted that he forcibly took it from her hand while she was talking on it and then he ran away with it. The prosecutor told the jurors they could find robbery in defendant's taking of Marcella's cell phone, purse, or lottery tickets. The court instructed the jurors they had to agree on which act constituted the robbery. (CALCRIM No. 3500.) If the jurors had been instructed on the claim-of-right defense, and had found it a valid defense to defendant's taking of the purse, they undoubtedly would still have found defendant guilty of robbing Marcella of her cell phone. Any error in failing to instruct on this defense was harmless beyond a reasonable doubt. (*Chapman v. California, supra,* 386 U.S. at p. 24.)

## III.    Ineffective Assistance of Counsel

Lastly, defendant argues that defense counsel was ineffective for failing to object to the prosecutor's misstatements of the law regarding voluntary manslaughter. For the third time, we conclude any error was harmless.

To establish ineffective assistance of counsel, a defendant must show (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and (2) counsel's deficient performance was prejudicial. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*).) To establish prejudice, defendant must make a showing "sufficient to undermine confidence in the outcome" that but for counsel's deficient performance there was a "reasonable probability" that "the result of the proceeding would have been different." (*Strickland, supra,* at p. 694; *Ledesma, supra,* at pp. 217-218.) On review, we can adjudicate an ineffective assistance claim solely on the issue of prejudice without determining the reasonableness of counsel's performance. (*Strickland, supra,* at p. 697; *Ledesma, supra,* at pp. 216-217; *People v. Hester* (2000) 22 Cal.4th 290, 296-297.) We will do so here.

"Where an intentional and unlawful killing occurs 'upon a sudden quarrel or heat of passion' (§ 192, subd. (a)), the malice aforethought required for murder is negated, and the offense is reduced to voluntary manslaughter—a lesser included offense of murder. [Citation.]" (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306 (*Carasi*).) "'The heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.]'" (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1143.) "Such heat of passion exists only where 'the killer's reason was actually obscured as the result of a strong passion aroused by a "provocation" sufficient to cause an "'ordinary [person] of average disposition … to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.'"' [Citation.] To satisfy this test, the victim must taunt the defendant or otherwise initiate the provocation. ([Citation]; e.g., *People v. Berry* (1976) 18 Cal.3d 509, 512–515 [young wife repeatedly subjected older husband to sexual insults, rejection, and admissions of infidelity, causing him to strangle her in jealous rage]; cf., *People v. Manriquez* (2005) 37 Cal.4th 547, 585-586 [provocation lacking where defendant calmly shot bar patron who insulted and goaded him into firing]; see also *People v. Gutierrez*[, *supra,*] 28 Cal.4th [at p.] 1144 [revenge does not reduce murder to manslaughter].)" (*Carasi, supra,* at p. 1306.)

"In a related vein, the "'existence of provocation which is not 'adequate' to reduce the class of the offense [from murder to manslaughter] may nevertheless raise a reasonable doubt that the defendant formed the intent to kill upon, and carried it out after, deliberation and premeditation'"—an inquiry relevant to determining whether the offense is premeditated murder in the first degree, or unpremeditated murder in the second degree. [Citations.] First degree willful, deliberate, and premeditated murder involves a cold, calculated judgment, including one arrived at quickly [citation], and is evidenced by planning activity, a motive to kill, or an exacting manner of death. [Citation.] Such state of mind 'is manifestly inconsistent with having acted under the heat of passion—even if

that state of mind was achieved after a considerable period of provocatory conduct.' [Citation.]" (*Carasi, supra,* 44 Cal.4th at p. 1306.)

Defendant correctly argues that the prosecutor, in his argument on voluntary manslaughter and sufficient provocation, interspersed incorrect statements of law with correct statements of law. In essence, the incorrect statements encouraged the jurors to consider whether the circumstances would cause an ordinary person to do what defendant did: stab Marcella 16 times. The correct standard is whether the circumstances would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection, and from this passion rather than from judgment. (*Carasi, supra,* 44 Cal.4th at p. 1306; *People v. Najera* (2006) 138 Cal.App.4th 212, 223-226.)

We also agree with defendant that there was evidence of provocation—Marcella's stealing his wallet, refusing to return it, and physically hitting and struggling with him to prevent him from recovering it. But even if we assume that the evidence satisfied the objective element (which was the element misstated by the prosecutor)—that these circumstances constituted provocation sufficient to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection, and from passion rather than from judgment—we nevertheless cannot agree that the record contains evidence that satisfied the *subjective* element—that *defendant's* "'reason was *actually* obscured as the result of a strong passion aroused by [the] "provocation ...."'" (*Carasi, supra,* 44 Cal.4th at p. 1306, italics added.) Defendant explained to the detectives that he and Marcella struggled and punched each other. He pushed her to the ground and demanded his wallet back as he brandished his knife. She still refused to let go of the purse, so he got on top of her and stabbed her two to five times in the torso. The evidence does not include any statement by defendant that he experienced a strong emotion or passion, such as rage or anger. In fact, his demonstration of the stabbing was remarkably devoid of passion, showing a few very slight and slow stabbing motions, which the detective described as "nonchalant." Furthermore, the people with whom

14.

defendant had contact shortly after the stabbing did not report any statements by defendant regarding his emotions during the stabbing. And defendant did not testify at trial. Under these circumstances, we simply do not find any record evidence to support the subjective element of the heat of passion required to reduce first degree murder to either second degree murder or voluntary manslaughter. The fact that the jury did not find defendant guilty of second degree murder rather than first degree murder, which would have required a finding that defendant made his "decision to kill … rashly, impulsively, or without careful consideration" rather than with deliberation and premeditation (as the jury was instructed by CALCRIM No. 521), further supports our conclusion that the evidence of a subjective element was not there.

Accordingly, we must conclude there is no reasonable probability that the result of the proceeding would have been different had defense counsel objected to the prosecutor's misstatements. Having found no prejudice, we reject defendant's contention. (*Strickland, supra,* 466 U.S. at pp. 693-694; *Ledesma, supra,* 43 Cal.3d at pp. 217-218.)

## DISPOSITION

The judgment is affirmed.

_____
Kane, J.

WE CONCUR:


_____
Wiseman, Acting P.J.


_____
Gomes, J.

15.