Filed 12/12/22  P. v. Tulanda CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>FRANCIS TULANDA,<br><br>    Defendant and Appellant. | B315420<br><br>(Los Angeles County<br>Super. Ct. No. MA073477-01) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daviann L. Mitchell, Judge.  Affirmed.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

—————————————————

Defendant and appellant Francis Tulanda appeals a judgment of conviction for felony murder and robbery. He contends that the trial court erroneously denied his motion for a judgment of acquittal.

Defendant also argues the trial court abused its discretion by overruling his objections to certain evidence. He first contends the court erroneously admitted a recording of a *Perkins*[1] operation because substantial parts of it were inaudible. Alternatively, defendant argues the trial court should have at a minimum excluded hearsay statements made by his accomplice to the *Perkins* agent. Finally, defendant contends the trial court erroneously permitted a police officer to opine about portions of the recording.

We reject defendant's arguments and affirm.

## BACKGROUND

A. *The Homicide of Vincent Roper and the Taking of Money from His House*

Many of the facts in this case were established by uncontradicted evidence. The victim was Vincent Roper (Roper), the father of defendant's ex-wife Reeneaka Roper.

On or about August 23, 2017, defendant, his friend Christopher Brandon, and Brandon's girlfriend Acorri Patton went to Roper's house in Palmdale to take money Roper kept in a safe. Defendant asked Roper to give him the money. When Roper refused, defendant and his accomplices engaged in a physical altercation with him.

---

[1] See *Illinois v. Perkins* (1990) 496 U.S. 292.

The injuries Roper sustained during this altercation led to his death. Roper's death was a homicide caused by "hemorrhage due to sharp-force injuries of the head."

While Roper was lying on the kitchen floor in a pool of blood, defendant went upstairs and retrieved a safe from one of Roper's bedrooms. Defendant and his accomplices left with the safe. As defendant expected, the safe contained substantial sums of cash. Roper died approximately 15 minutes after sustaining his injuries.

The main factual dispute between the parties concerns defendant's mens rea. Defendant claims he went to Roper's house to retrieve his own money that Roper stole from him. He also claims that he attempted to stop fighting Roper, but Roper kept attacking him. The People contend that defendant and his accomplices went to Roper's home to steel the victim's money, and that they intentionally killed Roper by stabbing him to death.

B.    *The Police Investigation*

On August 25, 2017, Marquisha Kirklin went to Roper's house to check on him. Kirklin often assisted Roper who was 64 years old and could not read or write. After finding Roper's front door open and furniture at the front of the house displaced, Kirklin called the police.

When Los Angeles County Sheriff's Department deputies arrived at the scene, they found obvious signs of an altercation downstairs. Roper was lying dead in the kitchen. Furniture and other items were strewed everywhere. Dried blood was splattered in numerous locations in several rooms. In a bedroom upstairs, the police found padding and plywood pulled back in the closet.

3

Police criminologists analyzed the DNA in samples of the blood they took from Roper's home. Defendant's DNA was found in several locations, including the dresser drawer and carpet in the bedroom and the wall next to the landing on the stairs. Brandon's and Patton's blood was also found at the scene.

Detective John Duncan subpoenaed records for Brandon's and defendant's telephones. The records indicated that from August 21 to 23, 2017, there were numerous communications between Brandon's phone and Roper's phone, and between defendant's phone and Brandon's phone. The records also indicated that these phones were near Roper's home when many of the calls were made.

On March 22, 2018, Detectives Duncan and Joseph Valencia interviewed defendant and Brandon. The detectives also sent an undercover agent to speak with them in jail. The interviews and the *Perkins* operation were recorded.

In their interviews, defendant and Branson falsely stated they did not know each other. They both also falsely denied having anything to do with Roper's homicide.

In the *Perkins* operation, the police recorded defendant and Brandon making numerous incriminating statements to the agent and each other. Most significantly, defendant discussed with the agent the circumstances he believed might have led to his arrest for murder.

Defendant claimed the victim owed him money for "weed." He further stated that he went to the victim's house and asked for his money. When the victim refused his request, defendant "[w]hooped his ass." Defendant denied intending to kill the victim. Rather, defendant stated, "I just wanted to get my shit" and "[t]each him a lesson."

Defendant told the agent that after he knocked the victim unconscious, he looked for money but could not find any. Defendant also mentioned the victim could not read or write.

In a separate conversation with the agent, Brandon described the victim as an "old man," defendant's "father-in-law," and defendant's "ex-wife's daddy." Brandon also told the agent about a violent altercation between the victim on one side and defendant, Brandon, and a woman on the other.

C.    *The Charges Against Defendant*

In an information, the People charged defendant with two counts: (1) murder (Pen. Code, § 187, subd. (a))[2] committed while engaged in the commission of a robbery and/or a burglary (§§ 211, 460) within the meaning of section 190.2, subdivision (a)(17); and (2) first degree residential robbery (§ 211) committed while personally using a deadly and dangerous weapon, namely a knife (§ 12022.7, subd. (a)). Charges against Brandon and Patton were tried separately.

D.    *The People's Case-in-Chief*

In July and August 2021, the superior court held a jury trial on the charges against defendant Tulanda. The following witnesses testified for the People: Reeneaka Roper, the victim's daughter; Kirklin, Roper's assistant; Deputy Luis Alvarez, the officer who first arrived at the scene; Detective Duncan, the lead detective on the case; criminologists Luis Olmos, Christopher Lee, and Gregory Wong, who collected and analyzed DNA from blood found in Roper's house; and Dr. Matthew Miller, the

---

[2]    Unless otherwise stated, all further statutory references are to the Penal Code.

5

pathologist who testified about Roper's autopsy. Outside the presence of the jury, the People called Brandon as a witness, but he invoked his right against self-incrimination and did not testify.

The People also played for the jury the recordings of Detective Duncan's interviews of defendant and Brandon and the recording of the *Perkins* operation. Additionally, the parties stipulated that, if sworn, Danielle Hefte, a cellphone analysis expert witness, would testify to certain facts about defendant's and Brandon's cellphones. Finally, the People moved into evidence various documents, including photographs of the crime scene.

After the People rested, defendant orally moved for entry of a judgment of acquittal pursuant to section 1118.1 on the ground there was no evidence that "anything was taken" from Roper. The trial court denied the motion, finding the jury could infer defendant took money.

E. *Defendant's testimony at trial*

Defendant testified on his own behalf. He told a story that was completely different than what he said to the police in his interview. Defendant's testimony also varied in important ways from what he told the *Perkins* agent. We summarize his testimony below.

In 2013, Roper was struggling financially. Defendant assisted him by purchasing groceries and paying for his rent and utilities for about a year. Defendant's relationship with Roper soured, however, when he learned from Reeneaka Roper's half-brother, Anton, that Roper went to defendant's house and took his safe. Defendant had $60,000 in the safe that he had earned as a licensed marijuana distributor.

In June of 2016, defendant went to Roper's house and asked for his safe. Roper responded by pointing a gun at defendant. Roper told defendant, "Forget the money. The money is mine now." When defendant protested, Roper said, "Get the fuck off my property before I blow your brain out."

Defendant claims he "didn't really care about the money"; he was upset about the deterioration of his relationship with Roper. But when Roper boasted about his theft to third parties and called defendant a "pussy" for not doing anything about it, defendant decided to take action.

On or about August 21, 2017, defendant, Brandon, and Patton went to Roper's home. Patton knocked on Roper's front door and claimed that her son's drone had fallen in his backyard. Through this deception, Patton gained entry to Roper's house. Defendant and Brandon waited in a car around the corner. Defendant and his accomplices believed that Roper would engage with Patton and try to have sex with her.

The plan was for Patton to put Visine eye drops in Roper's drink, causing him to fall asleep. While he was sleeping, defendant and Brandon would go into the house and take defendant's safe. But the plan failed after multiple attempts over the next few days. Defendant and Brandon then decided to confront Roper in his home.

Defendant politely asked, "Roper, can you please give me my money back?" Roper responded by punching Brandon in the face. This began a protracted physical fight in Roper's living room and kitchen. At one point Patton accidently sprayed Mace (pepper spray) into Brandon's mouth, incapacitating him. Defendant and Roper continued to fight. During the melee,

defendant told Roper he could keep the money if he let them go, but Roper kept attacking.

While defendant was fighting Roper, Patton hit Roper over the head with various pots and a broom handle. When Patton hit Roper's head with a "deep-fry pot" with four pointy edges, Roper was cut and started to bleed a little. The fight finally ended when Patton hit Roper five times with an iron pot in the kitchen, knocking him to the floor in an incapacitated state.

Defendant then went upstarts and searched both bedrooms for his safe. He found and took the safe out of a compartment in the floor of the guest bedroom's closet. He later found about $20,000 in the safe.

In cross-examination, defendant admitted that he did not have any documentation showing he had a marijuana distribution license. He also acknowledged that he did not report Roper's theft of $60,000 to the police or Roper's threat to "blow [his] brain out." Defendant further conceded that there were no pictures of a frying pan with four pointy edges in evidence. Finally, defendant admitted that although he had a video surveillance and alarm system in his home, he did not have a video of Roper stealing his safe.

F.    *The People's Rebuttal*

In the People's rebuttal, Reeneaka Roper testified. She stated defendant did not tell her he was assisting her father financially and there was no reason to believe that he did so. She also testified defendant never told her that Roper stole his money and there was no reason to believe any such theft occurred. Defendant's safe, moreover, only had about $4,000 in it. Finally, she stated that while she had a license to distribute marijuana, defendant did not.

Detective Duncan testified that he did not see any pots with four pointy edges at Roper's house.

### G. *Defendant's Conviction*

The jury returned a guilty verdict on both counts. The trial court then sentenced defendant to life imprisonment without the possibility of parole. Defendant timely appealed the judgment.

## DISCUSSION

### I. *The Trial Court Correctly Denied Defendant's Motion for a Judgment of Acquittal*

Defendant argues the trial court erroneously denied his section 1118.1 motion for a judgment of acquittal. He contends: "Brandon's statements were the only evidence presented as to the taking element of a robbery, but because he was an accomplice as a matter of law and his statements were not corroborated, the evidence was insufficient as a matter of law to allow a reasonable trier of fact to find that [defendant] committed robbery."

### A. *Applicable law*

#### 1. Claim-of-right defense

An essential element of robbery is that the defendant intended to take "another's property." (*People v. Gomez* (2008) 43 Cal.4th 249, 254.) Likewise, an element of burglary is that the defendant entered a dwelling or other statutorily defined space with the intent to take the "personal property of another." (§§ 459, 484.)

The taking element is not satisfied when "the taker entertains a good-faith belief that he has a right to the property taken, even if the belief is mistaken." (*People v. Johnson* (1991) 233 Cal.App.3d 425, 457 (*Johnson*); accord *People v. Hendricks*

9

(1988) 44 Cal.3d 635, 642 (*Hendricks*).) But when "the purported right is based in an illegal endeavor," the "felonious intent is not negated." (*Johnson, supra,* 233 Cal.App.3d at p. 457.) In other words, "[t]he claim-of-right defense is inapplicable to claims based on notoriously illegal activities."[3] (*Hendricks, supra,* 44 Cal.3d at p. 642.)

The claim-of-right defense also cannot be asserted against a robbery charge by a defendant who seeks to "satisfy, settle or otherwise collect on a debt." (*People v. Tufunga* (1999) 21 Cal.4th 935, 956 (*Tufunga*).) But if the defendant believes in good faith that he is recovering his specific property, he can assert the defense. (*Ibid.*)

### 2. Section 1118.1 motion

"When a trial court rules on a motion for a judgment of acquittal under section 1118.1, the standard the trial court must apply is the same as what the appellate court applies when reviewing the sufficiency of the evidence supporting conviction." (*People v. Wilson* (2021) 11 Cal.5th 259, 301.) "A court resolves a section 1118.1 motion by determining whether the prosecution presented sufficient evidence, *measured from the moment the section 1118.1 motion is made*, to permit the jury to resolve the issue. [Citation.] We review the trial court's determination de novo." (*Ibid.*, italics added.)

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to

---

[3] A claim-of-right is not a true affirmative defense because it is merely an argument to defeat one of the elements the People must prove. (See *People v. Anderson* (2011) 51 Cal.4th 989, 996–998.)

10

determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

We cannot reweigh the facts or the credibility of the witnesses. (*People v. Snow* (2003) 30 Cal.4th 43, 67.) The jury is free to "believe all, part, or none of any witness's testimony" (CALCRIM No. 226), even if it is uncontradicted, so long as it does not act arbitrarily. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 890; see also *People v. McCoy* (1995) 40 Cal.App.4th 778, 785.)

### 3. Accomplice testimony

"A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." (§ 1111.)

"'The corroborating evidence may be circumstantial or slight and entitled to little consideration when standing alone, and it must tend to implicate the defendant by relating to an act that is an element of the crime. The corroborating evidence *need not by itself establish every element of the crime*, but it must, without aid from the accomplice's testimony, tend to connect the defendant with the crime. [Citation.]'" (*People v. Abilez* (2007) 41 Cal.4th 472, 505, italics added.)

11

B.    *Legal Analysis*

Defendant makes two related but distinct arguments. He contends that when the People rested, there was no substantial evidence showing (1) he took any money from Roper's residence; and (2) if he did take money, it belonged to another. Without this evidence, defendant argues, the jury could not have convicted defendant of robbery and felony murder committed during a robbery.[4]

1.    Defendant's taking of money

Although defendant conceded in his own testimony that he took about $20,000 from Roper, he argues that when the People rested, there was insufficient evidence for the jury to conclude that he took any money. But as defendant acknowledges, his accomplice Brandon stated to the *Perkins* agent that defendant took money from Roper. The People presented the *Perkins* operation audio recording to the jury before resting.

Defendant argues that the People could not rely solely on Brandon's statements to the *Perkins* agent to prove the element of taking. Defendant is incorrect .

The People did not need to provide corroborating evidence regarding each element of defendant's crimes. All that was required was corroborating evidence, circumstantial or direct, tending to connect defendant to the crime. There was an abundance of such evidence here. For example, there was corroborating evidence that defendant engaged in the violent

---

[4]    Felony murder does not require that the robbery be successful; an attempted robbery will suffice. (§ 190.2, subd. (a)(17); CALCRIM No. 540A.)

confrontation in Roper's home that led to Roper's death. Defendant's blood and DNA were splattered all over the crime scene, and defendant admitted to "whooping" the victim.

In any case, besides Brandon's statements, there was circumstantial evidence that defendant took money from Roper. Defendant admitted that he went to Roper's home to collect money he alleges he was owed. Further, the rug and padding in one of the closets in Roper's home were lifted, indicating something was taken by the intruder. From these facts, the jury could have concluded that defendant in fact took money from Roper despite his contrary statement to the *Perkins* agent.

### 2. Defendant's claim-of-right defense

There was ample evidence supporting the jury's finding that the specific money defendant stole did not belong to him. Defendant admitted to the *Perkins* agent that he went to Roper's home to obtain money he was "owed" for "weed," and that when Roper did not give him what he wanted, he "[w]hooped his ass." Even if the jury credited defendant's claim that he was "owed" money by Roper (as opposed to just harboring a desire to steal a large sum of cash out of greed), a claim-of-right defense cannot excuse theft of funds to settle a perceived debt. (*Tufunga, supra,* 21 Cal.4th at pp. 954–956.)

Moreover, defendant stated to the *Perkins* agent that he earned the money by selling marijuana. When defendant moved for a judgment of acquittal, he had not yet presented evidence of his alleged marijuana distribution license. The jury could have properly inferred the alleged $60,000 defendant claimed he was owed consisted of illicit profits from marijuana sales. Such a finding would have also defeated defendant's claim-of-right defense. (*Hendricks, supra,* 44 Cal.3d at p. 642.)

13

## II. *The Trial Court Did Not Abuse Its Discretion When It Admitted the* Perkins *Operation Audio Recording*

Prior to trial, defendant moved to exclude the *Perkins* operation audio recording on the ground there were many portions of the recording that were inaudible. Defendant argues on appeal the trial court's denial of that motion was error.

We review a trial court's decision to admit evidence "'for abuse of discretion, and [the ruling] will not be disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice.'" (*People v. Powell* (2018) 5 Cal.5th 921, 951.) "When evidence is erroneously admitted, we do not reverse a conviction unless it is reasonably probable that a result more favorable to the defendant would have occurred absent the error." (*Ibid.*)

An audio recording "may be admissible even if substantial portions of it are unintelligible." (*People v. Siripongs* (1988) 45 Cal.3d 548, 574.) "'To be admissible, tape recordings need not be completely intelligible for the entire conversation as long as enough is intelligible to be relevant without creating an inference of speculation or unfairness.'" (*People v. Von Villas* (1992) 11 Cal.App.4th 175, 225; accord *People v. Jones* (2017) 3 Cal.5th 583, 611.)

Most of the recording at issue here consists of intelligible relevant statements made by defendant, Brandon, the agent, and police officers. The jury could have assessed that information without speculating. While substantial parts of the recording are inaudible, defendant was free to attack its probative value on that basis. There was nothing unfair about letting the jury decide for itself the probative value, if any, of the recording. The

trial court's decision to admit the recording therefore was not an abuse of discretion.

### III. *The Trial Court Did Not Abuse Its Discretion by Admitting Statements Brandon Made to the* Perkins *Agent*

Defendant filed a motion in limine to exclude as hearsay Brandon's statements to the *Perkins* agent while defendant was not present.  The People argued that the statements were admissible under Evidence Code section 1230 (section 1230) because they were against Brandon's penal interest.  The trial court denied the motion.  Defendant argues that the trial court abused its discretion.  We disagree.

The People do not dispute that Brandon's statements to the *Perkins* agent were hearsay.  (Evid. Code, § 1200.)  The issue is whether the statements fall within the exception to the hearsay rule set forth in section 1230.

Section 1230 provides in relevant part that a statement is not made inadmissible by the hearsay rule if the declarant is "unavailable," and the statement "subjected him to the risk of . . . criminal liability."  "[T]he rationale underlying the exception is that 'a person's interest against being criminally implicated gives reasonable assurance of the veracity of his statement made against that interest,' thereby mitigating the dangers usually associated with the admission of out-of-court statements." (*People v. Grimes* (2016) 1 Cal.5th 698, 711 (*Grimes*).)

In determining whether to apply this exception, the trial court should focus on the trustworthiness of the statement. (*People v. Masters* (2016) 62 Cal.4th 1019, 1055.)  This entails analyzing ""not just the words but the circumstances under which they were uttered, the possible motivation of the declarant,

15

and the declarant's relationship to the defendant." [Citation.]'" (*Id.* at pp. 1055–1056; accord *Grimes, supra,* 1 Cal.5th at p. 711.)

Brandon was unavailable at trial because he invoked his Fifth Amendment privilege against self-incrimination. His statements to the *Perkins* agent were against his penal interest because they tied him to Roper's murder. Brandon discussed in detail the violent confrontation he and his accomplices had with Roper. He also noted he was unlikely to have left any hair at the scene because he was "braided up." This shows a consciousness of guilt.

Brandon's statements to the agent were also reasonably trustworthy. He was good friends with defendant at the time. Indeed, outside the agent's presence, he and defendant confirmed their "love" for each other. Brandon had no discernable reason to falsely implicate himself and his friend in any crime. Under these circumstances, the trial court did not abuse its discretion in denying defendant's motion to exclude the statements.

## IV. *The Trial Court Did Not Commit Reversible Error by Overruling Objections to Detective Duncan's Testimony*

Over defendant's objections, Detective Duncan testified about Brandon's and defendant's statements made during the

*Perkins* operation.  Detective Duncan's testimony fell into two categories.[5]

    A.    *Testimony assisting the jury to understand the actions of the police*

"A lay witness may testify to an opinion if it is rationally based on the witness's perception and if it is helpful to a clear understanding of his testimony.  (Evid. Code, § 800.)" (*People v. Farnam* (2002) 28 Cal.4th 107, 153.)  A law enforcement officer may provide opinion testimony that helps explain police conduct and the scope of a police investigation.  (*People v. Virgil* (2011) 51 Cal.4th 1210, 1253–1254.)

Some of Detective Duncan's testimony regarding the *Perkins* operation falls into this category.  For example, Brandon stated to the agent there were no additional witnesses.  Detective Duncan testified that this statement was "very helpful with the investigation."  Another example is Detective Duncan's testimony regarding Brandon's statements about a woman meeting Roper on the day of his homicide.  According to Detective Duncan, this was the "first time we start to realize there was a plan regarding the murder of Mr. Roper."

Detective Duncan's testimony about how certain statements made during the *Perkins* operation affected the police

---

    [5]    Detective Duncan also explained what some slang terms meant.  Defendant concedes this testimony was admissible.

investigation was admissible. The trial court did not abuse its discretion in permitting such testimony.

B. *Testimony interpreting the probative significance of Brandon's and defendant's statements*

Detective Duncan also provided testimony about the *Perkins* operation that did not relate to the police investigation. Defendant objected to this testimony based on the "best evidence" rule, also known as the secondary evidence rule. Under this rule, the "content of a writing may be proved" with secondary evidence only if certain conditions are satisfied. (Evid. Code, § 1521, subd. (a).) The trial court correctly overruled this objection because Detective Duncan's testimony was not offered to prove the "content" of the recording; its content was undisputed.

Defendant also objected to Detective Duncan's testimony on the ground that it invaded "the province of the jury." "Witnesses must ordinarily testify to facts, leaving the drawing of inferences or conclusions to the jury or court." (*Froomer v. Drollinger* (1962) 201 Cal.App.2d 90, 98.) A police officer, however, may give a lay opinion about inferences he or she drew from observed facts. (*People v. Navarette* (2003) 30 Cal.4th 458, 497 [officer could offer lay opinion that button appeared to be ripped from jeans].)

Detective Duncan provided testimony that went beyond drawing reasonable inferences from facts he observed and crossed the line into improperly interpreting facts for the jury. For example, in the *Perkins* operation, Brandon told the agent, "she [Patton] kind of fucked up, but she was supposed to spray [Roper], but she sprayed me, bro." Referring to this statement, Detective Duncan testified: "Mr. Brandon talks about how *the plan* was for the female to come in and spray Mr. Tulanda [*sic*]. That would be, obviously, to disorient him." (Italics added.)

18

While Brandon's statement indicates that Patton mistakenly sprayed Brandon instead of Roper, it does not necessarily indicate that the three accomplices "planned" to spray Roper before they entered his house. Detective Duncan's testimony interpreting Brandon's statement was improper.

Another example is Detective Duncan's interpretation of the following conversation:

Defendant: "You think they have something on you?"

Brandon: "Huh."

Defendant: "You think they have something? (INAUDIBLE) talking about blood in the house."

Brandon: "(INAUDIBLE) same shit. (INAUDIBLE) lying. (INAUDIBLE) That's what I was thinking like, I hope uh, like you just don't crack when they tell you that bullshit. (INAUDIBLE) they don't have no blood. He said your blood all over the house. Damn, Frank, I love you, bro."

[¶] . . .[¶]

Brandon: "I love you too, man. I was thinking about you that whole time."

Regarding the above exchange, Detective Duncan testified: "It shows that they're worried about each other snitching on each other. You know, they're worried about some DNA. They're worried about blood coming back to them, the blood evidence; then they're just expressing their love and respect for each other, basically reassuring each other."

Although some of defendant's objections to Detective Duncan's testimony should have been sustained, defendant has not shown prejudice. The People presented overwhelming evidence supporting most of the facts they needed to prove to obtain felony murder and robbery convictions. Defendant even

19

admitted he went to Roper's house to retrieve money and that he was involved in the violent confrontation that led to Roper's death.  The only major factual dispute was whether defendant believed that the money he took belonged to Roper.  On that issue Detective Duncan's testimony about the *Perkins* operation audio recording was marginal at most.

Moreover, the trial court instructed the jury: "Witnesses who were not testifying as experts gave their opinions during the trial.  You may but are not required to accept those opinions as true or correct.  You may give the opinions whatever weight you think appropriate. . . . You may disregard all or any part of an opinion that you find unbelievable, unreasonable, or unsupported by the evidence."  The trial court further instructed the jury: "You must decide what the facts are.  It is up to you all of you, and you alone, to decide what happened based only on the evidence that has been presented to you in this trial."

We have no reason to believe the jury failed to make its own assessment of the *Perkins* operation audio recording; we assume the jury followed the trial court's instructions.  (*People v. Boyette* (2002) 29 Cal.4th 381, 431.)  Therefore, any error by the trial court in overruling defendant's objections to Duncan's testimony did not result in a miscarriage of justice.  (See *People v. Dryden* (2021) 60 Cal.App.5th 1007, 1027 ["Nothing in the record undermines our confidence that the jury followed those instructions and decided the issues based on its own assessment of the evidence"]; *People v. Riggs* (2008) 44 Cal.4th 248, 300–301 ["we see nothing in the record that would lead us to conclude that the jury was likely to disregard the instructions it received concerning its duty to decide the issues of credibility and guilt

based upon its own assessment of the evidence, not the opinions of any witness"].)

## DISPOSITION

The judgment is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

TAMZARIAN, J. [*]

We concur:

RUBIN, P. J.

BAKER, J.

---

[*] Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

21